[Nos. B182979, B183592. Second Dist., Div. Three. Jan. 25, 2007.]

PATRICK GILLAN, Plaintiff and Respondent, v.
CITY OF SAN MARINO et al., Defendants and Appellants.

**COUNSEL**

Cihigoyenetche, Grossberg & Clouse, Scott J. Grossberg, Richard R. Clouse, Amy von Kelsch-Berk, Angelica Arias; Pollak, Vida & Fisher, Girard Fisher, Michael M. Pollak and Daniel P. Barer for Defendants and Appellants.

Law Offices of John Burton and John Burton for Plaintiff and Respondent.

**OPINION**

**CROSKEY, J.**—The City of San Marino and three current or former police officials appeal a judgment after a jury trial, the denial of their motion for judgment notwithstanding the verdict, and a postjudgment order awarding attorney fees.[1] The judgment holds them liable for depriving Patrick Gillan of his rights in violation of Civil Code section 52.1, defamation, and intentional infliction of emotional distress, all in connection with Gillan's detention for the alleged sexual molestation of a minor. Defendants contend there was probable cause to arrest Gillan and contend they are immune from liability for defamation and intentional infliction of emotional distress in these circumstances. We conclude that there was no probable cause to arrest Gillan and thus he may recover on his Civil Code section 52.1 claim. Defendants, however, are immune from liability for defamation and intentional infliction of emotional distress, but they are not immune from liability for violation of Civil Code section 52.1 based on a false arrest. We conclude further that defendants are entitled to a new trial to determine the amount of compensatory damages.

---

[1] The individual appellants are Police Chief Arl Farris, former Lieutenant Christopher Petersen, and former Sergeant Eugene Street.

## *FACTUAL AND PROCEDURAL BACKGROUND*

### 1. *Accusation and Arrest*

A former member of the high school girls' basketball team told her psychiatrist in the autumn after her graduation that Gillan, the team coach, had sexually harassed her during her senior year. She also told her mother and her college basketball coach at about the same time. The psychiatrist immediately called the child protection hotline of the Los Angeles County Department of Children and Family Services and then called the City of San Marino Police Department. The psychiatrist later filed a report of suspected child abuse with the Department of Children and Family Services. After learning that the matter had been reported to the police, the accuser's mother called Sergeant Street, whose daughter had played on the same high school basketball team and whom both the accuser and her mother knew, and arranged for the accuser to make her statement to Sergeant Street.

Sergeant Street and another officer interviewed the accuser at the police station on December 13, 2001. The police recorded the interview. The accuser described several incidents of groping and other unwanted sexual contact in or about the high school gym and one incident in a hotel room in Palm Springs where the team was attending a tournament. Sergeant Street arranged for the accuser to wear a listening device and confront Gillan with her accusations.

The accuser approached Gillan the next day in the high school gym after a game and asked to talk with him in private outside. She stated that she needed to come to terms with the "touching and things like that" that allegedly had occurred the prior year. Gillan stated, "Touching? What do you mean?" After further discussion, Gillan asked for a specific example of what she was talking about. She stated, "Like one time I'm at practice and you come from behind me and you put your hand down my shorts." Gillan responded by addressing her by name and stating, "I'm not even going to respond to that." He stated further: "You made that up. You made that up. I have never done that." The police recorded the conversation.

The police also recorded a telephone call from the accuser to Gillan later that evening, on December 14, 2001. The accuser stated that she "need[ed] help" in order to "get some solutions, some closure." Gillan responded: "I've already called people at San Marino. I've warned them what's going on. Because you're obviously going after me." The accuser stated that she wanted to discuss what had happened, and Gillan responded, "It didn't happen." Gillan asked her to tell him what specifically had happened. She provided some specifics, and he denied them.

Gillan called an attorney, David Pierce, whose children attended the same high school and who also coached at the school. Gillan met with Pierce at the school on December 15, 2001, and Sergeant Street happened upon Pierce as he was leaving the meeting. Sergeant Street spoke with Pierce about the accusations and asked if Gillan would voluntarily submit to a police interview. Pierce stated that he was a civil attorney and would refer Gillan to a criminal attorney before responding to Sergeant Street's request. Meanwhile, the police interviewed the accuser again at her home on December 15 and concluded that her story was consistent. Pierce informed Sergeant Street on December 17, 2001, that Gillan would not submit to an interview.

Sergeant Street and the accuser met with a deputy district attorney on December 17, 2001. The deputy district attorney interviewed the accuser, but was not provided with the recordings. Sergeant Street also spoke with the supervisor of the deputy district attorney and informed the supervisor that the police intended to arrest Gillan later that day and immediately release him pursuant to Penal Code section 849, subdivision (b)(1).[2] The purposes of detaining Gillan in that manner were to publicize the "arrest" and invite any additional accusers to step forward, and to obtain his fingerprints and photograph to assist in the investigation. The high school principal informed Gillan that he was suspended with pay pending the investigation and relayed a request from the police for Gillan to turn himself in at the police station.

Gillan arrived at the police station at 2:00 p.m. on Monday, December 17, 2001, as requested. Pierce met him there. Gillan was booked, fingerprinted, and photographed. The police did not attempt to interview him. After one hour, the police provided Gillan with a document entitled "Detention Certificate" and released him. The detention certificate stated that he was released pursuant to Penal Code section 849, subdivision (b)(1) and that his taking into custody was only a detention, and not an arrest.

### 2. Press Release and News Briefing

The police department prepared a press release and provided it to a news service after Gillan was released. The press release stated: "The San Marino Police Department has arrested a school employee on sexual molestation charges alleged to have occurred against a student. [¶] The investigation has

---

[2] Penal Code section 849, subdivision (b) states: "Any peace officer may release from custody, instead of taking such person before a magistrate, any person arrested without a warrant whenever: [¶] (1) He or she is satisfied that there are insufficient grounds for making a criminal complaint against the person arrested." Section 849.5 states: "In any case in which a person is arrested and released and no accusatory pleading is filed charging him with an offense, any record of arrest of the person shall include a record of release. Thereafter, the arrest shall not be deemed an arrest, but a detention only."

widened to include a second school district in Los Angeles County. [¶] The assistance of the media is greatly appreciated in the event there are additional victims yet to be identified." The press release also announced a press briefing to take place on December 18, 2001.

Lieutenant Petersen read a prepared statement at the press briefing. The statement identified Gillan by name and stated that he had been arrested and booked for violation of Penal Code section 220, assault with intent to commit a felony. It stated that it was alleged that Gillan had "sexually molested a member of last year's girl's basketball team on several occasions," that the alleged victim was 17 years old at the time, that Gillan had previously coached at another high school, and that "this is an ongoing investigation during which time we are trying to determine weather [*sic*] or not we have any additional victims." It stated further that Gillan "was released from custody while we continue to investigate this matter." Petersen also stated to a reporter that the police had "supporting evidence," and the Los Angeles Times reported that statement. Other local newspapers also printed stories on the accusations.

### 3. *Further Investigation and Decision Not to Prosecute*

Further investigation revealed no additional accusers, witnesses, or significant corroborating evidence. On or about February 8, 2002, the district attorney declined to prosecute citing "lack of sufficient corroboration." The high school principal informed Gillan that he could return to work in a few days. Gillan returned to his job coaching the girls' basketball team on February 14, 2002, which was after the season but during the playoffs.

### 4. *Trial Court Proceedings*

Gillan filed a complaint against the city, Police Chief Farris, Lieutenant Petersen, Sergeant Street, and others in May 2002.[3] The operative second amended complaint filed in September 2002 alleges that Gillan's accuser and her mother fabricated the accusations against him, that the uncorroborated accusations were not reasonably believable, that the police arrested him without probable cause before conducting a reasonable investigation, and that defendants made false and defamatory statements about him to the press. The complaint alleges counts against the city and police officials for violation of Civil Code section 52.1, defamation, invasion of privacy, and intentional infliction of emotional distress.

---

[3] Gillan dismissed the defendants other than the appellants herein, including the accuser and her mother, before trial.

The city and the individual defendants demurred to each count alleged against them in the second amended complaint based on the immunity provided by Government Code section 821.6. The court overruled the demurrer. The same defendants moved for summary judgment or summary adjudication, arguing with respect to the count for violation of Civil Code section 52.1 that there was probable cause for the arrest, and arguing that they were immune from liability for the other counts under Government Code section 821.6. The court denied the motion. Defendants challenged the denial of their motion for summary judgment or summary adjudication by petitioning this court for an extraordinary writ. We denied the petition in April 2004 (*City of San Marino v. Superior Court* (Apr. 28, 2004, B174330)).

Gillan dismissed his count for invasion of privacy before opening statements. The court instructed the jury on the counts for violation of Civil Code section 52.1, defamation, and intentional infliction of emotional distress. The court also instructed that the court would determine whether there was probable cause to arrest Gillan.

The jury returned a special verdict on January 20, 2005, finding with respect to the first count that (1) the individual defendants did not "reasonably believe [the accuser's] statements before the arrest"; (2) the individual defendants did not "reasonably" disbelieve Gillan's denials of those accusations as expressed by Gillan in the recordings; (3) the individual defendants did not "reasonably believe there were sufficient grounds to file a criminal complaint with the District Attorney's office before they arrested plaintiff"; (4) the individual defendants did not "reasonably believe there were sufficient grounds to file a criminal complaint with the District Attorney's office at the time they released plaintiff"; (5) the individual defendants did not "intend, prior to the arrest, to release plaintiff without arresting him if he talked to them about [the accuser's] statements"; (6) the individual defendants did not "reasonably believe plaintiff would talk to them if he were arrested"; (7) Gillan was "harmed by the arrest"; (8) the acts of each of the three individual defendants were a "substantial factor in causing the harm"; (9) each of the individual defendants "violated plaintiff's rights secured by the Constitution or laws of the United States or California"; (10) Gillan was "harmed by the violation"; and (11) the acts of each of the individual defendants was a substantial factor in causing the harm. The jury also found that each of the defendants had defamed Gillan and intentionally inflicted emotional distress upon him and that Lieutenant Petersen and Sergeant Street acted with malice or oppression. The jury found that Gillan's total compensatory damages, undifferentiated by count, were $4,453,000, including $1,937,000 for "[p]ast loss" and $2,516,000 for "[f]uture loss."

The court in a written ruling filed on January 20, 2005, found that defendants had no probable cause to arrest Gillan at the time of the arrest. The court reasoned that if defendants believed at the time of the arrest that there was insufficient evidence to make a criminal complaint against Gillan, as stated in the detention certificate, they could not have believed that there was probable cause to arrest him. The court concluded that defendants misused Penal Code section 849 by arresting Gillan "for purposes other than instituting a proper criminal complaint or charge—it was used as an investigative tool without a good faith belief there were sufficient grounds to file a criminal complaint." The court concluded that defendants arrested Gillan for an improper purpose and stated: "The improper reasons for the arrest at the time it was made before the investigation was completed, far outweigh the general rule that law enforcement officers may rely on a victim's statements in making an arrest. . . . Had defendants simply concluded that [the accuser's] statements were credible without going through their improper 849 process, a different result might have been reached. But, they tainted the arrest by their 849 actions and contradicted themselves as to their belief of whether there was sufficient grounds to make a criminal complaint." The court stated further: "Defendants had no compelling reason to arrest before they did a thorough investigation. There was no threat of flight, no imminent harm, no exigent circumstances and no other information on plaintiff compelling the arrest at that time."

The jury awarded a total of $16,430 in punitive damages against Lieutenant Petersen and Sergeant Street in the second phase of trial. The court entered a judgment on January 25, 2005, awarding Gillan $4,453,000 in compensatory damages against the four defendants jointly and severally, and awarding a total of $16,430 in punitive damages against Lieutenant Petersen and Sergeant Street.

Defendants moved for judgment notwithstanding the verdict arguing with respect to the first count that the information known to them at the time of the arrest, considered objectively, created probable cause regardless of their subjective motive in making the arrest. They also argued with respect to the counts for defamation and intentional infliction of emotional distress that they were immune from liability under Government Code sections 821.6 and 820.2. The court denied the motion. In its ruling, the court acknowledged that an arresting officer's state of mind ordinarily is irrelevant to the determination of probable cause to arrest, but stated that in this case an analysis of probable cause "in its purest sense" was inappropriate because "the abusive application of [Penal Code] § 849 . . . taints the entire arrest procedure." The court stated with respect to Government Code section 821.6: "The press release was part of the planned effort against plaintiff without probable cause and was done solely for the purpose of exposing plaintiff to public scrutiny in hopes of obtaining victims of his alleged proclivities to come forward. The press

conference was conducted after defendants had certified that there were insufficient grounds to hold him under arrest or make a criminal complaint. § 821.6 is designed to protect public employees from entities' malicious prosecution actions—that is, it provides immunity when a public employee initiates or procures an arrest and prosecution under lawful process but with malicious motive and without probable cause. The court has determined that the § 849 process was not lawful and that process was the foundation for the planned publicity event the following day. Thus, once again defendants' abuse of § 849 taints their entire planned efforts against plaintiff and their further abuse of the press conference is unprotected by any of the asserted immunities."

The court also denied defendants' motion for a new trial based on excessive damages and other grounds. The court awarded Gillan $1,042,456.50 in attorney fees under Civil Code section 52.1, subdivision (h) in a minute order dated May 12, 2005. Defendants appealed the judgment and the order denying their motion for judgment notwithstanding the verdict (case No. 182979) and separately appealed the order awarding attorney fees (case No. 183592). We have consolidated the two appeals.

## CONTENTIONS

Defendants contend: (1) they had probable cause to arrest Gillan based on the accuser's statements and reports by others who interviewed her; (2) Government Code sections 821.6 and 820.2 immunize them from liability for violation of Civil Code section 52.1, defamation, and intentional infliction of emotional distress; (3) if the immunity applies to only the counts for defamation and intentional infliction of emotional distress, defendants are entitled to a new trial on damages caused by the false arrest; and (4) we must reverse the attorney fee award if we reverse the judgment.

## DISCUSSION

### 1. Standard of Review

A party is entitled to a judgment notwithstanding the verdict on a timely motion if there is no substantial evidence to support the verdict and the evidence compels a judgment for the moving party as a matter of law. (Code Civ. Proc., § 629; *Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877–878 [151 Cal.Rptr. 285, 587 P.2d 1098].) If the motion challenges the sufficiency of the evidence to support the verdict, we review the ruling under the substantial evidence standard. (*Clemmer, supra,* at pp. 877–878; *Shapiro v. Prudential Property & Casualty Co.* (1997) 52 Cal.App.4th 722, 730 [60 Cal.Rptr.2d 698].) If the motion presents a legal question based on undisputed

facts, however, we review the ruling de novo. (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284 [73 Cal.Rptr.2d 596].) If we determine that the trial court denied a motion for judgment notwithstanding the verdict that should have been granted, we must order the entry of judgment in favor of the moving party. (Code Civ. Proc., § 629.)

### 2. *There Was No Probable Cause to Arrest Gillan*

■ The first count in the second amended complaint is labeled violation of Civil Code section 52.1, commonly known as the Bane Act. Section 52.1 establishes a private right of action for damages and other relief against a person who "interferes by threats, intimidation, or coercion," or attempts to so interfere, with the exercise or enjoyment of an individual's constitutional or other legal right. (*Id.*, subds. (a), (b).) The court instructed the jury that the three counts against defendants were for violation of Civil Code section 52.1, defamation, and intentional infliction of emotional distress, and instructed on the elements of Civil Code section 52.1 (BAJI No. 7.90). The court also separately instructed on the elements of false arrest (Judicial Council of Cal. Civil Jury Instns. (2003–2004) CACI No. 1401) and indicated that the basis for the alleged Bane Act violation was an arrest without probable cause. The special verdict form included questions as to what defendants "reasonably believe[d]" at the time of the arrest, as we have stated, but the court reserved for itself the question whether there was probable cause for the arrest. The essential basis for the first count is an arrest without probable cause.

■ " 'Probable cause exists when the facts known to the arresting officer would persuade someone of "reasonable caution" that the person to be arrested has committed a crime. [Citation.] "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts . . . ." (*Illinois v. Gates* (1983) 462 U.S. 213, 232 [76 L.Ed.2d 527, 103 S.Ct. 2317].) It is incapable of precise definition. (*Maryland v. Pringle* (2003) 540 U.S. 366, 371 [157 L.Ed.2d 769, 124 S.Ct. 795].) " 'The substance of all the definitions of probable cause is a reasonable ground for belief of guilt,' " and that belief must be "particularized with respect to the person to be . . . seized." (*Ibid.*)' [Citation.]" (*People v. Thompson* (2006) 38 Cal.4th 811, 818 [43 Cal.Rptr.3d 750, 135 P.3d 3].) " ' "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." ' (*Maryland v. Garrison* (1987) 480 U.S. 79, 87 [94 L.Ed.2d 72, 107 S.Ct. 1013].)" (*Id.* at p. 820.) Upon proof that an arrest and confinement occurred without process and that the plaintiff was damaged, the defendant has the burden of persuasion to prove that the arrest was justified. (*Cervantez v. J. C. Penney Co.* (1979) 24 Cal.3d 579, 592 & fn. 7 [156 Cal.Rptr. 198, 595 P.2d 975].)

"Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." (*Whren v. United States* (1996) 517 U.S. 806, 813 [135 L.Ed.2d 89, 116 S.Ct. 1769].) Probable cause is measured by an objective standard based on the information known to the arresting officer, rather than a subjective standard that would take into account the arresting officer's actual motivations or beliefs. (*Johnson v. Lewis* (2004) 120 Cal.App.4th 443, 454 [15 Cal.Rptr.3d 507].) The arresting officer's actual motivations or beliefs should play no role in the court's determination of probable cause. (*Ibid.*)

■ California courts generally distinguish police informers, who may be implicated in criminal activity and may expect to receive a personal benefit as a result of providing information, from victims and chance witnesses of crimes who volunteer information. (*Humphrey v. Appellate Division* (2002) 29 Cal.4th 569, 575–576 [127 Cal.Rptr.2d 645, 58 P.3d 476]; *People v. Ramey* (1976) 16 Cal.3d 263, 269 [127 Cal.Rptr. 629, 545 P.2d 1333].) "It may . . . be stated as a general proposition that private citizens who are witnesses to or victims of a criminal act, absent some circumstance that would cast doubt upon their information, should be considered reliable." (*Ramey, supra,* at p. 269.) Information provided by a crime victim or chance witness alone can establish probable cause if the information is sufficiently specific to cause a reasonable person to believe that a crime was committed and that the named suspect was the perpetrator. (*Ibid.*) "[N]either a previous demonstration of reliability nor subsequent corroboration is ordinarily necessary when witnesses to or victims of criminal activities report their observations in detail to the authorities." (*Ibid.*)

We conclude, based on our independent review of the record, that the information provided by the accuser lacked sufficient indicia of reliability with respect to the alleged sexual molestation. Some of the accusations were generalized and not specific as to time, date, or other details, including claims of touching in the gym. Other accusations concerning more specific events either lacked sufficient detail or were inconsistent in the details provided. In her initial police interview on December 13, 2001, which was recorded, the accuser stated that the first incident of sexual harassment occurred during the summer in a hotel room in Palm Springs, where the team was participating in a tournament. She stated that while they were sitting on a bed discussing basketball, Gillan put his hand on her thigh and moved his hand up to her crotch, that she moved away, and that he then moved closer to her, stroked her hair, and kissed her neck. She stated that she told him, "I gotta go," and left. Describing the same incident later in the same interview, however, she did not state that he touched her crotch, and when questioned about it stated, "There were times where he actually did get down my gym shorts, you know," but "[n]ot this time."

She stated in the initial interview that the next incident occurred during the summer on the day before a game in which he berated her as "worthless." She stated that after engaging her in small talk, Gillan touched her through her clothes as she stood against a wall inside a room. She could not recall which room it was: "It could have been—in the big gym, that dressing room. His office maybe. Sorry, I can't give you the exact details." When Sergeant Street asked her to be more specific as to what occurred on that occasion, she reverted to generalizations: "I mean it's always kind of the same. He would always just touch me." "In this instance—humm—I can't just be so specific. He always grabbed my breasts, always felt those, and then moved down and sometimes feel my butt. And I believe he went to my crotch that time. Umm—it's just that—it was always the same."

She stated in the initial interview that Gillan's first attempt to have her orally copulate him occurred during winter break after Christmas. She stated that she was sitting on a bench in the gym and asked Gillan for the key to the gym so she could practice. She stated that Gillan sat next to her and that when she told him of her anxiety on game days, he touched her as if to comfort her, removed the tip of his penis from his pants, and placed her hand on his penis. She stated that when she resisted, he pushed her head down toward his crotch, but that she managed to break away and leave. Sergeant Street asked if Gillan threatened her at that time not to tell anybody. She responded, "Not at that particular time, no." Later in the same interview, however, when asked when Gillan first threatened her not to tell anybody, she stated, "I think it was like after the first time he tried to get me to go down on him."

The accuser also stated in the initial interview that Gillan approached her in the girls' locker room before Christmas, reached under her shorts from behind, and touched her vaginal area through her underwear. She then stated that the incident did not occur in the girls' locker room but in a different room known as the team room. She stated that Gillan's second attempt to have her orally copulate him occurred in January in the girls' locker room after school. She stated that Gillan made her sit down, sat down next to her, put her hand on his thigh, unbuttoned his pants, and put her hand on his penis. She stated that he then forced her head down into his lap and that she turned her head away. She stated that when she managed to break away and got up to leave, he hit her with the back of his hand. She also described other alleged incidents of unwanted touching. She repeatedly expressed her strong antipathy toward Gillan based on his treatment of her as a player on the basketball team apart from the alleged sexual harassment.

The police did not audio-record the second interview, but produced a written report describing the details of 10 purported incidents based on information obtained in both interviews. The information in the report

differed from that provided in the initial interview in that the report stated that the second incident occurred on the day after the game in which Gillan berated the accuser, rather than the day before the game as stated in the initial interview. The report also stated that Gillan's first attempt to have her orally copulate him occurred in the gym at the beginning of the season in October, rather than during winter break after Christmas as she had stated before. The report also stated that Gillan placed his hand inside the accuser's shorts in the girls' locker room, rather than the team room.

Other information known to the police at the time of Gillan's detention included the suspected child abuse report by the accuser's psychiatrist, the recording of the conversation between Gillan and the accuser outside the gym, and the recording of their telephone conversation the following day. The suspected child abuse report of information provided by the accuser, although generally consistent with the information provided in the initial interview, provided few details. The two recordings did not suggest any consciousness of guilt or any attempt to silence the accuser, but only vehement denials and disbelief. Sergeant Street also received a phone call from a vice-principal at the school who told him that she was skeptical of the accusations against Gillan and that the other coaches felt the same way.

We conclude, as did the jury, based on the totality of the circumstances, that the information known to the police at the time of Gillan's detention was not sufficiently consistent, specific, or reliable to cause a reasonable person to believe the accusations of sexual molestation. This is true particularly in light of the exculpatory nature of Gillan's statements in the recordings and the comments by the vice-principal, and the accuser's strong antipathy toward Gillan based on his treatment of her as a player on the team. We therefore conclude that there was no probable cause to detain Gillan based on the accusations.[4]

3. *Government Code Section 821.6 Provides a Complete Defense to the Counts for Defamation and Intentional Infliction of Emotional Distress but Is Not a Defense to the Count for Violation of Civil Code Section 52.1*

A public employee acting within the scope of employment is immune from liability for an injury caused by the employee's "instituting or prosecuting any judicial or administrative proceeding . . . even if he acts maliciously

---

[4] We need not decide whether defendants acted properly under Penal Code section 849, subdivision (b)(1). Regardless of whether they acted properly under the statute, there was no probable cause to arrest Gillan.

and without probable cause." (Gov. Code, § 821.6.)[5] California courts construe section 821.6 broadly in furtherance of its purpose to protect public employees in the performance of their prosecutorial duties from the threat of harassment through civil suits. (*Ingram v. Flippo* (1999) 74 Cal.App.4th 1280, 1293 [89 Cal.Rptr.2d 60]; *Cappuccio, Inc. v. Harmon* (1989) 208 Cal.App.3d 1496, 1500–1501 [257 Cal.Rptr. 4]; *Randle v. City and County of San Francisco* (1986) 186 Cal.App.3d 449, 457 [230 Cal.Rptr. 901].)

Government Code section 821.6 immunizes not only the act of filing or prosecuting a judicial or administrative complaint, but also extends to actions taken in preparation for such formal proceedings. (*Amylou R. v. County of Riverside* (1994) 28 Cal.App.4th 1205, 1209–1210 [34 Cal.Rptr.2d 319].) An investigation before the institution of a judicial proceeding is part of the prosecution of a judicial proceeding for purposes of the statute, even if the authorities later decide not to file charges. (*Ingram v. Flippo, supra,* 74 Cal.App.4th at p. 1293; *Amylou R., supra,* at pp. 1209–1211.) Acts undertaken in the course of an investigation, including press releases reporting the progress or results of the investigation, cannot give rise to liability. (*Ingram, supra,* at p. 1293 [held that statements concerning an investigation that were made in a press release "were part of the prosecution process" and therefore immune]; *Amylou R., supra,* at pp. 1210–1211 [held that statements made to the plaintiff in the course of an investigation were "incidental to the investigation" and therefore immune].) The immunity applies even if the officers abused their authority. (*Randle v. City and County of San Francisco, supra,* 186 Cal.App.3d at pp. 456–457.)

Immunity under Government Code section 821.6 is not limited to claims for malicious prosecution, but also extends to other causes of action arising from conduct protected under the statute, including defamation and intentional infliction of emotional distress. (*Kayfetz v. State of California* (1984) 156 Cal.App.3d 491, 492 [203 Cal.Rptr. 33] [defamation]; *Kemmerer v. County of Fresno* (1988) 200 Cal.App.3d 1426, 1435–1437 [246 Cal.Rptr. 609] [intentional infliction of emotional distress].) Section 821.6, however, provides no immunity from liability for false arrest or false imprisonment.[6] (*Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710, 719–722 [117 Cal.Rptr. 241, 527 P.2d 865].) The California Supreme Court in *Sullivan* concluded based on the statutory language and legislative history that section 821.6 was not intended to change the common law rule, preserved in

---

[5] "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." (Gov. Code, § 821.6.)

[6] " ' "[F]alse arrest" and "false imprisonment" are not separate torts. False arrest is but one way of committing a false imprisonment . . . .' [Citation.]" (*Asgari v. City of Los Angeles* (1997) 15 Cal.4th 744, 752, fn. 3 [63 Cal.Rptr.2d 842, 937 P.2d 273].)

Government Code section 820.4, that a public employee can be liable for false imprisonment.[7] (*Sullivan, supra,* at pp. 719–722.)

█ Although a public employee, and his or her public entity employer (Gov. Code, § 815, subd. (a)), can be liable for false imprisonment, the recoverable damages are limited to damages for injuries caused by conduct that occurred during the period of false imprisonment. Government Code section 821.6 precludes the recovery of damages for injuries caused by conduct that occurred after the false imprisonment had ended, even if that conduct was causally related to the false imprisonment. (*Asgari v. City of Los Angeles, supra,* 15 Cal.4th at pp. 754–758.)

The plaintiff in *Asgari* was falsely imprisoned for seven days until he was arraigned on a felony charge. He then remained in prison until he was acquitted at trial seven months later. (*Asgari v. City of Los Angeles, supra,* 15 Cal.4th at pp. 751, fn. 2 & 757.) *Asgari* rejected the federal rule from *Smiddy v. Varney* (9th Cir. 1981) 665 F.2d 261 allowing the recovery of damages for injuries caused by incarceration after the time a false imprisonment ends and imprisonment under lawful process begins unless the institution of criminal charges breaks the chain of causation. (*Asgari, supra,* at pp. 754–760.) *Asgari* distinguished false imprisonment, "defined as 'the "unlawful violation of the personal liberty of another" ' " " ' "without lawful privilege," ' " from malicious prosecution, which " ' "consists of initiating or procuring the arrest and prosecution of another under *lawful process,* but from *malicious motives* and *without probable cause.* . . ." ' " (*Asgari, supra,* at p. 757.) *Asgari* concluded that the plaintiff's false imprisonment ended when he was arraigned on a felony charge because his confinement from that time forward was pursuant to lawful process. (*Ibid.*) *Asgari* concluded further that Government Code section 821.6 precluded the recovery of damages for injuries caused by the plaintiff's incarceration after his arraignment on formal charges. (*Asgari, supra,* at p. 758.) "[P]ermitting an arrestee to recover damages arising from incarceration following his or her arraignment on formal charges effectively would nullify, in part, the statutory immunity for malicious prosecution." (*Id.* at p. 758, fn. 10.) *Asgari* stated that it would be absurd if an officer who falsely arrested a suspect and then knowingly provided false information to the prosecutor could be liable for damages arising from the entire period of incarceration, but the same officer providing the same false information would be absolutely immune from liability if he proceeded directly to the prosecutor and the malicious prosecution were not preceded by a false arrest.

---

[7] Government Code section 820.4 states: "A public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."

(*Id.* at pp. 758–759.) Thus, *Asgari* establishes that conduct that is immunized under section 821.6 cannot give rise to liability for damages due to a prior false arrest.

■ The evidence here shows that the press releases and other public statements by the individual defendants were made in the course of their investigation of a purported crime and in furtherance of the investigation. Regardless of whether those statements were reasonable and appropriate, on the one hand, or made maliciously as part of a baseless threatened prosecution, on the other hand, we conclude based on the authorities we have cited that the individual defendants are immune from liability for defamation or intentional infliction of emotional distress based on those statements pursuant to Government Code section 821.6.[8] The city also therefore is immune from liability on those counts arising from the acts of the individual defendants. (*Id.*, § 815.2, subd. (b).)[9]

The count for violation of Civil Code section 52.1 is based on an arrest without probable cause, as we have stated. Because Government Code section 821.6 provides no immunity from liability for false arrest or false imprisonment (*Sullivan v. County of Los Angeles, supra,* 12 Cal.3d at pp. 719–722), section 821.6 provides no immunity from liability under Civil Code section 52.1 based on an arrest without probable cause. *O'Toole v. Superior Court* (2006) 140 Cal.App.4th 488 [44 Cal.Rptr.3d 531], cited by defendants, is not on point. The plaintiffs in that case alleged that the defendants violated Civil Code section 52.1 by enforcing a permit restriction that unduly restricted their right of free speech. (*O'Toole, supra,* at p. 497.) *O'Toole* held that Government Code section 820.6, which provides immunity for public employees acting in good faith under the apparent authority of an enactment that is unconstitutional, invalid, or inapplicable, applied. *O'Toole* explained that a statutory immunity generally overrides a statutory liability absent a clear indication of a legislative intent to the contrary, and found no indication that the Legislature intended to override or create an exception to the immunity provided by Government Code section 820.4. (*O'Toole, supra,* at p. 504.) Here, in contrast, the California Supreme Court has determined that Government Code

---

[8] We need not decide whether defendants acted properly under Penal Code section 849, subdivision (b)(1). Regardless of whether they acted properly under the statute, defendants are immune from liability for statements made in connection with the investigation. "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, *even if he acts maliciously and without probable cause.*" (Gov. Code, § 821.6, italics added.)

[9] "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." (Gov. Code, § 815.2, subd. (b).)

section 821.6 was not intended to protect public employees from liability for false arrest or false imprisonment. (*Sullivan, supra,* at pp. 719–722.)

### 4. *Government Code Section 820.2 Provides No Defense to the Count for Violation of Civil Code Section 52.1*

 Government Code section 820.2 states: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." The statute was intended to restate the common law immunity for discretionary acts within the scope of public employment. (*Caldwell v. Montoya* (1995) 10 Cal.4th 972, 980 [42 Cal.Rptr.2d 842, 897 P.2d 1320].) The immunity does not apply to all acts by public employees within the literal meaning of the term "discretionary." Rather, the immunity is more limited. (*Caldwell, supra,* at p. 981.)

"[A] 'workable definition' of immune discretionary acts draws the line between 'planning' and 'operational' functions of government. (*Johnson [v. State of California* (1968)] 69 Cal.2d [782,] 793, 794 [73 Cal.Rptr. 240, 447 P.2d 352].) Immunity is reserved for those '*basic policy decisions* [which have] . . . been [expressly] committed to coordinate branches of government,' and as to which judicial interference would thus be 'unseemly.' (*Id.* at p. 793, italics in original.) Such 'areas of quasi-legislative policy-making . . . are sufficiently sensitive' (*id.* at p. 794) to call for judicial abstention from interference that 'might even in the first instance affect the coordinate body's decision-making process' (*id.* at p. 793)." (*Caldwell v. Montoya, supra,* 10 Cal.4th at p. 981, some brackets added by *Caldwell.*)

The decision to arrest Gillan was not a basic policy decision, but only an operational decision by the police purporting to apply the law. The immunity provided by Government Code section 820.2 therefore does not apply.

### 5. *Defendants Are Entitled to a New Trial on Compensatory Damages*

 An error is prejudicial and results in a miscarriage of justice only if the reviewing court concludes, based on its review of the entire record, that it is reasonably probable that a result more favorable to the appellant would have been reached absent the error. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [16 Cal.Rptr.3d 374, 94 P.3d 513].) The giving of a jury instruction not supported by the evidence is prejudicial only "when it appears probable that the improper instruction misled the jury and affected the verdict." (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1213 [31 Cal.Rptr.2d 776, 875 P.2d 1279].) The court here instructed the jury on defamation and

intentional infliction of emotional distress, including the measure of damages for past and future losses, despite the statutory immunity provided by Government Code section 821.6. This was error. Defendants did not invite the error by proposing those instructions after their unsuccessful attempts to defeat those counts by demurrer and summary adjudication. (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212–213 [285 Cal.Rptr. 99, 814 P.2d 1341]; *Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1555 [6 Cal.Rptr.2d 698].)

We conclude that the error was prejudicial because it appears likely that the jury based its award of damages for past and future losses in large part on injuries to Gillan's reputation, earning capacity, and emotional well-being resulting from the statements made by defendants after his release. Gillan's counsel in closing argument emphasized the publicity following the detention, the resulting continuing injury to his reputation until his name was cleared at trial, and his past and future emotional distress resulting from the injury to his reputation.[10] Moreover, the substantial amounts awarded for past loss ($1,937,000) and future loss ($2,516,000) strongly suggest that the damages award was intended to compensate Gillan for injuries resulting from the statements made in the press conference and to the media after his release rather than only for his injuries resulting from his one-hour detention. Accordingly, defendants are entitled to a new trial to determine the amount of compensatory damages resulting from the false arrest and violation of Civil Code section 52.1.[11] (*Asgari, supra,* 15 Cal.4th at p. 760.) Gillan may recover damages for all injuries caused by the false arrest and violation of Civil Code section 52.1, including emotional distress and loss of reputation that were caused by the false arrest but suffered after he was released, but may not recover damages for injuries caused by defendants' protected conduct after

---

[10] Gillan's counsel stated in closing argument: "So what we suggest is that you pick a number for each of these million people who heard this, who coach Gillan's reputation is living in their minds. And I would suggest a number between $1 million—I am sorry—between $1 and $5 per person. That is, it's just $1 or $5 for each of these million people. And so from that, I came up with damage to reputation $1 million to $5 million dollars. And then I split it half in the past, half in the future." Counsel did not separately request damages for reduced earning capacity. Counsel also requested $300,000 to $750,000 in damages for emotional distress resulting from the arrest and publicity of the arrest, $110,000 to $275,000 for emotional distress suffered while Gillan "waited 55 days for this public humiliation to finally come to an end with the district attorney's rejection of the charges," $100,000 to $150,000 for emotional distress suffered during the three years before trial while he "lived with this stigma with a police department still to this day saying that he did these horrible things," and $388,000 to $1.1 million for future emotional distress resulting from the publicity. Counsel did not quantify the damages resulting from the false arrest alone, and requested only $10,000 for Gillan's past out-of-pocket expenses for legal fees and therapists.

[11] Defendants do not mention the award of punitive damages in their argument challenging the award of damages and therefore have waived any claim of error with respect to punitive damages. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317].)

Gillan's release. (*Asgari*, at pp. 756–758; *County of Los Angeles v. Superior Court* (2000) 78 Cal.App.4th 212, 222–224 [92 Cal.Rptr.2d 668].)

Courts have held in some circumstances that a defendant who fails to request a special verdict segregating the elements of damages forfeits the right to challenge a separate element of damages on appeal. (*Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1158 [46 Cal.Rptr.3d 780]; *Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 346 [100 Cal.Rptr.2d 854].) The reason for this rule is that a reviewing court ordinarily cannot determine what amount was awarded for each element of damages requested and therefore cannot determine whether any error with respect to a particular element of damages was prejudicial. (*Greer, supra*, at p. 1158; *Heiner, supra*, at p. 346.) Thus, the rule is based on the presumption that an appealed judgment is correct (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]) and the requirement that an appellant must present a record sufficient to overcome that presumption (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295 [240 Cal.Rptr. 872, 743 P.2d 932]; *Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502 [93 Cal.Rptr.2d 97]). The only valid basis for liability here, however, is the count for violation of Civil Code section 52.1 based on a false arrest, so the presumption of correctness cannot justify an award of damages in excess of the amount properly recoverable on that count.

6. *The Attorney Fee Award Must Be Reversed*

■ Our reversal of the judgment necessarily compels the reversal of the award of fees as costs to the prevailing party based on the judgment. (*Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1284 [114 Cal.Rptr.2d 898]; *Merced County Taxpayers' Assn. v. Cardella* (1990) 218 Cal.App.3d 396, 402 [267 Cal.Rptr. 62].) "After reversal of a judgment 'the matter of trial costs [is] set at large.' [Citation.]" (*Allen, supra*, at p. 1284.)

## DISPOSITION

The judgment is reversed with directions to the superior court to conduct a new trial limited to determining the amount of compensatory damages to be awarded on Gillan's first count for violation of Civil Code section 52.1 based on a false arrest, defendants' liability on that count having been established. The order denying the motion for judgment notwithstanding the verdict is affirmed as to the first count and reversed as to the counts for defamation and intentional infliction of emotional distress, with directions to the superior court to enter a judgment in favor of defendants on the latter

two counts at the conclusion of the proceedings on remand. The superior court is further directed to award in that judgment the punitive damages previously awarded against Lieutenant Petersen and Sergeant Street. The order awarding attorney fees is reversed, and the court in its discretion may award fees at the conclusion of the proceedings on remand. Each party is to bear its own costs on appeal.

Klein, P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied February 21, 2007, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied May 23, 2007, S151528.