**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KESNER JUNIOR LIBERAL,
          *Plaintiff-Appellee,*

v.

EDUARDO R. ESTRADA, individually
and in his capacity as a Menlo
Park police officer; JEFF KEEGAN,
individually and in his capacity as
a Menlo Park police officer;
RICHARD WHEATON, individually
and in his capacity as a Menlo
Park police officer; JAIMEE TASSIO,
individually and in his official
capacity as a Menlo Park police
officer; RONALD PRICKETT,
individually and in his capacity as
a Menlo Park police officer; JAIME
ROMERO, individually and in his
capacity as a Menlo Park police
officer; BARBARA AYRES,
individually and in her capacity as
a Menlo Park police officer,
          *Defendants-Appellants,*

and

CITY OF MENLO PARK,
          *Defendant.*

No. 08-17360

D.C. No.
CV 07-0024 SBA

OPINION

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted
December 10, 2009—San Francisco, California

923

Filed January 19, 2011

Before: A. Wallace Tashima, Susan P. Graber, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Graber;
Partial Concurrence and Partial Dissent by Judge Tashima

**COUNSEL**

John L. Flegel, Jorgenson, Siegel, McClure & Flegel, LLP, Menlo Park, California, for the defendants-appellants.

Anthony Boskovich, Law Offices of Anthony Boskovich, San Jose, California, for the plaintiff-appellee.

**OPINION**

GRABER, Circuit Judge:

Plaintiff Kesner Liberal sued the City of Menlo Park ("City") and seven of its police officers, individually and in their official capacities, under 42 U.S.C. § 1983, for violations of his civil rights arising from a traffic stop and subsequent events. He also brought several claims under California law

against the City and its officers. Defendants filed a motion for summary judgment, asserting federal qualified immunity and state statutory immunity. The district court denied several officers' claims of qualified immunity on Plaintiff's § 1983 claims. With regard to the state-law claims, the district court denied the City and several officers state statutory immunity. The individual officer-defendants filed this interlocutory appeal. We dismiss in part, affirm in part, and remand.

## FACTUAL BACKGROUND

A. *The Initial Traffic Stop*

On an October night in 2005, at about 1:40 a.m., Plaintiff, an African-American male, was acting as the designated driver for two friends after a night out. His passengers were Keith Hamilton, who also is African-American, and Tony Martinez, who is Mexican-American. Plaintiff testified that his front driver- and passenger-side windows were not tinted and that they were rolled down and therefore not visible.[1] His rear driver- and passenger-side windows and rear windshield had a reflective tint. Traffic was light, and Plaintiff was obeying all traffic laws as he traveled north at approximately 30 miles per hour on El Camino Real, an arterial road in Menlo Park, California.

Officer Estrada was on duty in his patrol car. He was stopped at a red light in the southbound left-turn lane of El

---

[1]Officer Estrada maintains that Plaintiff's front driver-side window was rolled up and illegally tinted. Therefore, he contends, he had probable cause to stop Plaintiff's car. Officer Estrada further maintains that, because the windows were tinted, he could not determine the races of the car's occupants before pulling it over. For purposes of qualified immunity and summary judgment determinations, however, we view all facts in the light most favorable to Plaintiff, as the nonmoving party. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in other part by Pearson v. Callahan*, 555 U.S. 223 (2009); *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). We recount the facts accordingly.

Camino Real. Plaintiff testified that Officer Estrada could see into Plaintiff's car through the rolled-down front window because, as Plaintiff passed the police car, the officer "follow-[ed] [him] with his eyes."

As Plaintiff continued north, Officer Estrada turned on the lights of his patrol car, but not its siren, and made a U-turn through the red light to follow Plaintiff. Not knowing whether the officer was attempting to pull over his car, but suspecting that he might be, Plaintiff made a right turn at the next light while the officer was approximately 300 feet behind him. Then, almost immediately, Plaintiff made a left turn into an unlit parking lot behind a walk-up burger stand. He parked near a dumpster and turned off his headlights. Officer Estrada followed Plaintiff's car into the parking lot at high speed. The officer parked behind Plaintiff and shined his spotlight at the car.

Officer Estrada testified that he was "agitated," "a little pumped up," and "a little scared" as he approached Plaintiff's car with his hand on his gun. He ordered Plaintiff and his passengers to put their hands up and out of the windows of the car. They complied. Officer Estrada then requested Plaintiff's driver's license and registration, which Plaintiff provided. Plaintiff asked why he had been pulled over. In response, Officer Estrada accused Plaintiff of trying to flee, which Plaintiff denied.

The police dispatch logs show that Officer Estrada reported making this traffic stop at 1:43 a.m. Within one minute of that time, he asked for a DMV check on Plaintiff's license plate, called in Plaintiff's driver's license and date of birth, reported that three subjects were trying to flee, and requested backup, which was dispatched immediately. Officer Keegan, the first backup officer to arrive on the scene, was there by 1:44:47 a.m. Officer Keegan testified that Plaintiff was "verbally confrontational," making statements such as, "You stopped me for no reason." Over the next several minutes, Officers Ayres,

Romero, Tassio, and Wheaton, and Sergeant Prickett—essentially the entire Menlo Park Police watch—arrived on the scene.

## B.  *Plaintiff and Martinez Are Handcuffed*

Throughout the stop, Tony Martinez had been sitting in the right rear passenger seat, talking on his cell phone. After running Plaintiff's information, Officer Estrada approached the rear passenger window and began yelling at Martinez to get off the phone.

At that point, Officer Estrada, Officer Keegan, or both, ordered Plaintiff to get out of his car. There is some uncertainty as to which officer handcuffed Plaintiff or whether one assisted the other. As Plaintiff began to step out of the car, an officer grabbed him by the wrist, pulled him out of the car, spun him around, and pushed him against the rear door of the car. Plaintiff was shoved against the door with enough force to rock the car, but the impact did not "knock [his] breath away." He was then handcuffed and led to sit on the front bumper of Officer Keegan's police car. Officer Estrada asked Martinez to get out of the car, handcuffed Martinez, and sat him on the trunk of Plaintiff's car.

## C.  *The Tape Recording*

Officer Estrada continued to yell at Martinez and Plaintiff, demanding to know why they had tried to flee. At that point, Plaintiff made comments to the effect that the traffic stop constituted harassment because of his race, that Martinez did not have to answer Officer Estrada's questions, and that Plaintiff was going to contact his lawyer. Officer Keegan then pulled out an audio recorder, showed it to Plaintiff, and began recording.

The audio recording reveals that Officer Keegan partially *Mirandized* Plaintiff, telling him that "everything you say can

and will be used against you in a court of law." Plaintiff believed at that time that he was under arrest. Officer Estrada, not knowing that the conversation was being recorded, returned to speak to Plaintiff:

> [Officer Estrada]: Here's the deal, ok? This is the way I do business, ok. If you would have pulled over and not tried to ditch me [inaudible], ok, then you and I would have been having a more decent conversation, ok. But you tried to ditch me, I get behind you, and then you start shooting off your mouth to me, and then your friends are joining along. I got to make a decision here.

> [Plaintiff]: Um.

> [Officer Estrada]: Let me finish.

> [Plaintiff]: Yeah, I, that's why I [inaudible] I thought you was done sir.

> [Officer Estrada]: Don't interrupt. I need to make, I need to make a decision here. I'm going to decide whether I'm going to let three little punks walk all over me, and the reason I call you punks is you're acting that way. I['m] gonna have to decide whether I'm going to let three little punks walk all over me or whether or not to sit on you real fast and let you know that I'm the one in charge here, not you, ok. You understand me? Now, let me explain something else to you too. You may be able to get away with smarting off to some of the younger cops, you're not going to do that with me and I'll explain to you why, ok. Because, since I had no desire to become sergeant, I really don't give a rat's ass who I piss off. I don't care about complaints.

> [Plaintiff]: I know you don't care I can see that.

> [Officer Estrada]: Ok, so, so, so, it's a lot of things in that Penal Code that I could arrest you right now for if I wanted to, so if I was you, I would just keep your mouth shut, don't try to, don't try to get smart with me, and we might have a better evening, you understand me? Do you understand me?

The audio recording captured Officer Estrada repeatedly accusing Plaintiff of trying to "ditch" him and of lying about it. Plaintiff denied the officer's accusations and claimed that he had made the right turn off El Camino Real, before he realized that Officer Estrada was trying to pull him over, because that was the way to his friend's house.

The tape also captures Officer Estrada uncuffing Plaintiff after requiring Plaintiff to answer verbatim that he would "remain a gentleman." Plaintiff estimates that he was handcuffed for approximately 25 to 30 minutes during the 45-minute stop.

At one point, Sergeant Prickett told Plaintiff that he was "just being damn right ignorant" by pulling over into a darkened alley. Sergeant Prickett continued, "I mean stop, stop on the road because if this officer is not sure what's going on and you do something stupid once he comes up on you, it's very easy to get shot, you know, his safety is in jeopardy. Really, especially, you know, doing the whole routine back here."

D.   *The Search of Plaintiff's Car*

Plaintiff saw up to six officers searching the area around his car, including the nearby dumpster. He concluded that they were looking for drugs. After uncuffing Plaintiff, Officer Estrada grabbed Plaintiff by the arm, led him to his car, and asked him whether he owned the car and whether the officers could search it. Plaintiff answered "yes" to both questions. Plaintiff was then put, uncuffed, into the back seat of an officer's patrol car while his car was searched.

Officer Estrada and other officers searched Plaintiff's car thoroughly, "turn[ing] everything upside down." The search uncovered only a lawfully possessed, unloaded pellet hand-gun. The discovery of the pellet gun appears to have resulted in having the second passenger, Hamilton, handcuffed for about five minutes.

E.   *The Sobriety Tests and Line-Up*

Throughout the stop, Officers Keegan and Estrada questioned Plaintiff about how much alcohol he had consumed that night. He answered that he "had probably two beers." Officer Estrada administered two nystagmus tests to Plaintiff and determined that he was not intoxicated.

Plaintiff testified that, at the end of the stop, he and his passengers were lined up in front of about four officers. Plaintiff recalls Officer Estrada saying to him, "I wish you were drunk so I [had] a reason to take you in." According to Plaintiff, Officer Estrada then told Martinez, "You know I can get you for drunk in public." Martinez protested, saying, "How? You pulled me out of the back of the car."

Finally, Officer Estrada advised them that, had they made a wrong move, he would have "busted a cap" in them right between the eyes, and that he and his partner liked to go to "night target practice." After that, Plaintiff and his passengers were allowed to leave. Plaintiff was never told why Officer Estrada initially pulled him over, and no one was cited for any violation.

## PROCEDURAL BACKGROUND

Plaintiff brought the present action, alleging claims under both federal and state law arising from the foregoing events. Defendants moved for summary judgment on the ground that they had immunity from suit on all claims. The district court granted their motion in part and denied it in part. The individ-

ual officers appeal the district court's order to the extent that any officer was denied summary judgment on any claim.[2] Plaintiff does not appeal.[3] The City does not appeal.[4]

## A. *Partial Denial of Summary Judgment for Federal Claims*

The district court denied Officer Estrada qualified immunity for the traffic stop because, construing the facts in Plaintiff's favor, there was neither probable cause for the stop nor reasonable suspicion of illegal activity. The officer's determination that Plaintiff's windows were rolled up and tinted did not qualify as a "reasonable mistake," considering Plaintiff's testimony that the windows were rolled down and therefore

---

[2]In their opening brief, the individual officer-defendants presented no argument on their own behalf concerning the claims for intentional infliction of emotional distress, negligence, and negligent infliction of emotional distress. Accordingly, those issues are waived, *see Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990), and we do not consider them. Only the issue of state statutory immunity with regard to the false imprisonment claim remains.

[3]The district court granted summary judgment to all individual defendants except Officer Estrada with regard to the traffic stop, and to all individual defendants except Officers Estrada and Keegan for handcuffing Plaintiff. The court also granted summary judgment to Officers Keegan, Romero, and Ayres for the search of Plaintiff's car. It further granted summary judgment to all individual defendants with regard to Plaintiff's claims for race discrimination under the Equal Protection Clause of the Fourteenth Amendment and for excessive force under the Fifth Amendment's Due Process Clause. Moreover, the court granted summary judgment to the City on Plaintiff's § 1983 claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Those rulings are not before us.

[4]The City argued before the district court that it was entitled to immunity to the same extent that its individual officers were immune. In support, the City pointed to California Government Code section 815.2(b), which provides: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." Accepting the City's argument, the district court granted summary judgment to the City to the same extent that it granted the individual officers' motions for summary judgment.

not visible. The district court further denied qualified immunity to Officers Estrada and Keegan with regard to Plaintiff's claims that they used excessive force by handcuffing him in the absence of any information leading them to believe that he was potentially dangerous.

As to Plaintiff's claim that his detention was an unconstitutionally long seizure, the district court denied qualified immunity to all individual defendants. The court explained that it could not find as a matter of law that the individual defendants, as required by *United States v. Sharpe*, 470 U.S. 675, 686 (1985), "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."

The district court then denied qualified immunity to various officers on Plaintiff's claims arising from the search of his car. Construing the facts in the light most favorable to Plaintiff, the district court concluded that the search of Plaintiff's car violated clearly established Fourth Amendment law because Plaintiff's consent to the search was not voluntary and because the traffic stop occurred without probable cause. Officers Estrada and Wheaton testified that they searched the car. After being asked whether Defendants Estrada, Tassio, or Prickett also searched the car, Officer Wheaton responded, "I think at one point everybody had their hands in something." The district court therefore ruled that there was a triable issue of fact as to whether Defendants Estrada, Wheaton, Tassio, and Prickett violated Plaintiff's Fourth Amendment rights in searching his car. The court granted summary judgment to the other individual officers who were not implicated in the search.

The officer-defendants now appeal the denial of summary judgment, on qualified immunity grounds, as to all federal claims.

B.  *Partial Denial of Summary Judgment for State-Law Claims*

Plaintiff also brought state-law claims against all individual officers and the City for false imprisonment, assault, battery, intentional infliction of emotional distress, negligence, negligent infliction of emotional distress, and a violation of California Civil Code section 52.1, which provides a private cause of action for interference with the exercise or enjoyment of one's state or federal civil rights.[5] The officers contended that they were immune from those state-law claims because they have discretionary immunity under California Government Code section 820.2, which states: "Except as otherwise pro-

---

[5]California Civil Code section 52.1 provides, in relevant part:

(a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured. An action brought by the Attorney General, any district attorney, or any city attorney may also seek a civil penalty of twenty-five thousand dollars ($25,000). If this civil penalty is requested, it shall be assessed individually against each person who is determined to have violated this section and the penalty shall be awarded to each individual whose rights under this section are determined to have been violated.

(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured.

vided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."[6]

Despite Defendants' assertion of immunity, the district court partially denied summary judgment to various officers on Plaintiff's state-law claims. With respect to the traffic stop itself, the district court denied summary judgment to Officer Estrada on Plaintiff's claims of false imprisonment, negligence, negligent and intentional infliction of emotional distress, and a violation of section 52.1. The court also denied summary judgment to Defendants Estrada, Wheaton, Tassio, and Prickett on Plaintiff's claims of negligence, negligent and intentional infliction of emotional distress, and a violation of section 52.1, predicated on the search of Plaintiff's car. The court denied summary judgment to all individual officers on Plaintiff's claims of false imprisonment, negligence, negligent infliction of emotional distress, and a violation of section 52.1, based on the length of the detention. Finally, the court denied summary judgment to Officers Estrada and Keegan on all of Plaintiff's state-law claims premised on the use of force.

---

[6]The officers also asserted "due care" immunity under California Government Code section 820.4, immunity for peace officers making an arrest based on probable cause under California Penal Code sections 847(b) and 836.5, lawful privilege to detain under *Asgari v. City of Los Angeles*, 937 P.2d 273, 281 (Cal. 1997) (clarifying that, in order to establish the tort of false imprisonment under California law, a confinement must be without lawful privilege), and privilege to use force under California Penal Code section 835a. The district court rejected the officers' assertion of those immunities with respect to various claims. On appeal, the officers argued for the first time in their reply brief that the district court erred in denying the individual officers immunity under California Penal Code sections 836.5 and 847 and California Government Code section 820.4. Because those issues were not raised in the officers' opening brief, they have been waived. *See Eberle*, 901 F.2d at 818. The officers at no time challenged the district court's partial denial of summary judgment on the basis of lawful privilege to detain under *Asgari*, or privilege to use force under Penal Code section 835a. Therefore, we decline to address those issues.

The district court granted summary judgment in favor of all other individual defendants on all other state-law claims.

In this appeal, the officer-defendants contend that Officers Estrada and Keegan are entitled to summary judgment as a matter of law on Plaintiff's assault and battery claims, because Plaintiff has not demonstrated that the officers used unreasonable force or that such force caused him injury, damages, loss, or harm. The officers further argue that all individual defendants are entitled to statutory immunity from the false imprisonment claim under California Government Code section 820.2.[7] Finally, the officers assert that, if the individual defendants are entitled to qualified immunity under § 1983, then they bear no liability under California Civil Code section 52.1, because liability under the two statutes is coextensive.

## STANDARD OF REVIEW

We review de novo the district court's denial of summary judgment on the ground of qualified immunity. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993). We must affirm a denial of summary judgment when, viewing the evidence in the light most favorable to the nonmoving party, there remain genuine issues of material fact or when the uncontroverted facts establish that the moving party is not entitled to prevail as a matter of law. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). "The determination of immunity is a question of law, which we review de novo." *Id.*

---

[7]The officers also assert immunity for the City under California Government Code section 815 with respect to Plaintiff's claims of negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. We do not reach that argument because only the individual defendants have appealed; they cannot claim an immunity that protects only the City.

## JURISDICTION[8]

**[1]** A court of appeals has jurisdiction over appeals from "final" orders. 28 U.S.C. § 1291. But as the Supreme Court explained in *Mohawk Industries, Inc. v. Carpenter*, 130 S. Ct. 599, 605 (2009):

> This Court . . . has long given § 1291 a practical rather than a technical construction. . . . [T]he statute encompasses not only judgments that terminate an action, but also a small class of collateral rulings that, although they do not end the litigation, are appropriately deemed "final."

(Internal quotation marks and citation omitted.) "Ordinarily a denial of a motion for summary judgment is not a final order and thus [is] not appealable." *Abend v. MCA, Inc.*, 863 F.2d 1465, 1482 n.20 (9th Cir. 1988). In *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), however, the Supreme Court held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of . . . § 1291 notwithstanding the absence of a final judgment." In so holding, the Court reasoned that, because qualified immunity "is an *immunity from suit* rather than a mere defense to liability[,] . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 526. Thus, whether a denial of an immunity is immediately appealable turns on whether the immunity at issue is an immunity from suit or only a defense to liability.

**[2]** We clearly have jurisdiction to review the district court's order denying the officers qualified immunity with respect to Plaintiff's federal claims. *Mitchell* held that such jurisdiction lies under § 1291. *Id.* at 530.

---

[8]The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367(a).

**[3]** We cannot, however, exercise jurisdiction over the appeal from the denial of summary judgment to Officers Estrada and Keegan on Plaintiff's state-law claims for assault and battery. Essentially, the officers disagree with the district court's interpretation of the facts. Because the officers appeal from an ordinary denial of summary judgment on those claims, as opposed to a denial of immunity, that section of the order is not an appealable final judgment under § 1291. We therefore dismiss the officers' appeal with respect to the assault and battery claims.

**[4]** We turn, then, to the officers' appeal from the district court's denial of immunity under California Government Code section 820.2 with respect to Plaintiff's false imprisonment claim. We agree with our sister circuits that the availability of an appeal depends on whether, under *state* law, the immunity functions as an immunity from suit or only as a defense to liability. *See Chesher v. Neyer*, 477 F.3d 784, 793 (6th Cir. 2007) ("An order denying statutory immunity is immediately appealable only if the state law provides immunity from suit, as opposed to immunity simply from liability."); *Aspen Orthopaedics & Sports Med., LLC v. Aspen Valley Hosp. Dist.*, 353 F.3d 832, 837-38 (10th Cir. 2003) (same); *Gray-Hopkins v. Prince George's County*, 309 F.3d 224, 231-32 (4th Cir. 2002) (same); *Sheth v. Webster*, 145 F.3d 1231, 1236-38 (11th Cir. 1998) (per curiam) (same); *Walton v. City of Southfield*, 995 F.2d 1331, 1343 (6th Cir. 1993) (same), *superseded by statute as stated in Livermore ex rel. Rohm v. Lubelan*, 476 F.3d at 397, 407-08 (6th Cir. 2007); *Griesel v. Hamlin*, 963 F.2d 338, 339-41 (11th Cir. 1992) (per curiam) (same); *Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir. 1991) (same); *Brown v. Grabowski*, 922 F.2d 1097, 1106-09 (3d Cir. 1990) (same); *Sorey v. Kellett*, 849 F.2d 960, 962-63 (5th Cir. 1988) (same); *Marrical v. Detroit News, Inc.*, 805 F.2d 169, 172-74 (6th Cir. 1986) (per curiam) (same).

**[5]** The reasoning of our sister circuits on this point is straightforward. Under *Erie Railroad Co. v. Tompkins*, 304

U.S. 64 (1938), federal procedure governs the appealability of an order. *Marrical*, 805 F.2d at 172; *accord Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 198-99 (1988). A denial of summary judgment is immediately appealable when the immunity is an immunity from suit, but not when it is a mere defense to liability. *Mitchell*, 472 U.S. at 526. Accordingly, a denial is immediately appealable when "the state has extended an underlying substantive right to the defendant official to be free from the burdens of litigation." *Marrical*, 805 F.2d at 172.

**[6]** Applying that standard, we hold that the district court's denial of immunity under California Government Code section 820.2 is a final appealable decision within the meaning of § 1291. Although the question is not free from doubt, we conclude that, under California law, section 820.2 confers immunity from suit.

First, California case law suggests that section 820.2 provides immunity from suit, rather than mere immunity from liability. For example, the California Supreme Court has stated that the California Tort Claims Act ("Act"), which is codified in part at California Government Code section 820.2, "generally affords a public employee *personal immunity from suit*." *Caldwell v. Montoya*, 897 P.2d 1320, 1322 (Cal. 1995) (emphasis added). The court also observed that "the . . . Act expressly allows public employees to engage in certain acts and omissions *free of suit*." *Id.* at 1331 (emphasis added).[9]

---

[9]Additionally, the California Supreme Court wrote:

> We do not mean to suggest that a high official's public explanation of the reasons for his basic policy decision should be *immune from suit* if his comments are themselves actionable unless privileged. We merely express concern that public commentary might be discouraged by *allowing suits* in which such commentary would provide evidence of the allegedly impermissible motives behind the basic policy decision.

*Caldwell*, 897 P.2d at 1327 n.4 (emphases added) (citations and original emphases omitted).

In another case, the California Supreme Court noted that, if the defendants' "contention [of immunity under section 820.2] were sound, the individual defendants would be *immune from suit*." *Ramos v. County of Madera*, 484 P.2d 93, 98 (Cal. 1971) (emphasis added). That court also has explained that section 820.2 protects officials' decisions "which are sufficiently sensitive to justify a blanket rule that courts *will not entertain* a tort action alleging that careless conduct contributed to the governmental decision." *Johnson v. State*, 447 P.2d 352, 360-61 (Cal. 1968) (emphasis added). Taken at face value, the California Supreme Court's statements suggest that the statutory immunity is an immunity from suit.

Second, although California's procedural rules concerning appealable orders do not allow interlocutory appeals from denials of immunity, Cal. Civ. Proc. Code § 904.1(a), California's strict statutory classification of appealable orders has been relaxed by "the great expansion of the concept of excess of jurisdiction, allowing the prompt prevention of some unwarranted orders by writ of prohibition" and "[b]y permitting review of nonappealable orders by writ of mandamus."[10] 9 B.E. Witkin, *California Procedure, Appeal* § 88 (5th ed. 2008). California courts sometimes have used these extraordinary writs to review otherwise nonappealable orders involving immunity claims under the Act. *See, e.g.*, *Jacqueline T. v. Alameda Cnty. Child Protective Servs.*, 66 Cal. Rptr. 3d 157, 162-63 (Ct. App. 2007) (discussing the reviewing court's previous grant of a writ of mandate reversing the trial court's denial of defendants' statutory immunity claims at the summary judgment stage).

Third, the policy underlying the Act suggests that section 820.2 confers immunity from suit. In *Caldwell*, 897 P.2d at

---

[10]California's procedural treatment of interlocutory orders involving section 820.2 is instructive as to the nature and scope of the immunity under state law, even though federal procedure governs here.

1327, and in *Johnson*, 447 P.2d at 360-61, the California Supreme Court cautioned that allowing suits against public employees might interfere with governmental decision-making. Moreover, in *Barner v. Leeds*, 13 P.3d 704, 709 (Cal. 2000), the court wrote:

> Immunity is reserved for those basic policy decisions which have been expressly committed to coordinate branches of government, and as to which judicial interference would thus be unseemly. Such areas of quasi-legislative policy-making are sufficiently sensitive to call for judicial abstention from interference that might even in the first instance affect the coordinate body's decision-making process.

(Internal quotation marks, citations, and alterations omitted.) The court thus articulated one of the "general costs of subjecting officials to the risks of trial—. . . inhibition of discretionary action." *Mitchell*, 472 U.S. at 526 (internal quotation marks omitted).

[7] Those considerations lead us to conclude that we have appellate jurisdiction to review the district court's denial of statutory immunity under California Government Code section 820.2, because this section functions as an immunity from suit. But the question under California Civil Code section 52.1 is different. The officers' only argument with respect to section 52.1 pertains to the extent of their liability —that is, whether it is coextensive with federal liability. This section does not create an entitlement to immunity from suit. Therefore, the district court's rulings under section 52.1 are not presently appealable.

In summary, we have jurisdiction to review the denial of summary judgment, on grounds of qualified immunity, with respect to Plaintiff's federal claims. We also have jurisdiction to review the denial of summary judgment, on the ground of discretionary immunity under section 820.2, with respect to

Plaintiff's state-law claim of false imprisonment. We turn now to a consideration of those issues on the merits.

## DISCUSSION

### A. *The Traffic Stop*

We affirm the district court's denial of summary judgment on the ground of qualified immunity to Officer Estrada for the initial traffic stop. Qualified immunity shields government officers from the burdens of litigation "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). An officer is entitled to qualified immunity if, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged [do not] show the officer's conduct violated a constitutional right" or if the right violated was not clearly established at the time of the violation. *Saucier*, 533 U.S. at 201. We may "exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

[8] Viewing the facts in the light most favorable to Plaintiff, Officer Estrada violated Plaintiff's clearly established constitutional right to be free from unreasonable seizures by initiating a traffic stop without having a reasonable suspicion that Plaintiff was engaged in illegal activity. We must assume that Plaintiff's front windows were rolled down, and therefore not visible to Officer Estrada at the time he initiated the traffic stop. In those circumstances, Officer Estrada's determination that Plaintiff's windows were both rolled up and visibly tinted resulted from a mistake of fact. This mistake of fact, according to Officer Estrada, led him to conclude that the condition of Plaintiff's car violated California Vehicle Code sections 26708 and 26708.5(a).[11] Officer Estrada therefore decided that he had reasonable suspicion to initiate a traffic stop.

---

[11]California Vehicle Code section 26708 provided, at the time of the traffic stop, in relevant part:

"It has been settled law since the 1970's that in order for a police officer to initiate an investigatory stop of a motorist, there must at least exist reasonable suspicion that the motorist is engaging in illegal activity." *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003), *abrogated on other grounds by Virginia v. Moore*, 553 U.S. 164 (2008), *as recognized in Edgerly v. City of San Francisco*, 599 F.3d 946, 956 n.14 (9th Cir. 2010). In order to form a reasonable suspicion, an officer must have "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) (internal quotation marks omitted).

Even if an officer makes a mistake of fact, that mistake "will not render a stop illegal, if the objective facts known to

---

(a)(1) A person shall not drive any motor vehicle with any object or material placed, displayed, installed, affixed, or applied upon the windshield or side or rear windows.

. . . .

(b) This section does not apply to any of the following:

. . . .

(4) Side windows that are to the rear of the driver.

. . . .

(8) The rear window or windows, if the motor vehicle is equipped with outside mirrors on both the left- and right-hand sides of the vehicle that are so located as to reflect to the driver a view of the highway through each mirror for a distance of at least 200 feet to the rear of the vehicle.

California Vehicle Code section 26708.5(a) provides:

No person shall place, install, affix, or apply any transparent material upon the windshield, or side or rear windows, of any motor vehicle if the material alters the color or reduces the light transmittance of the windshield or side or rear windows, except as provided in subdivision (b), (c), or (d) of Section 26708.

the officer gave rise to a reasonable suspicion that criminal activity was afoot." *United States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002). As the Supreme Court has recognized:

> [I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present. In such cases those officials should not be held personally liable. The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.

*Rodis v. City of San Francisco*, 558 F.3d 964, 970-71 (9th Cir. 2009) (internal quotation marks, citations, and alterations omitted), *cert. denied,* 130 S. Ct. 1050 (2010). "Nevertheless, an officer's belief in a mistaken fact must be held reasonably and in good faith." *United States v. Miguel*, 368 F.3d 1150, 1154 (9th Cir. 2004) (internal quotation marks omitted); *see United States v. Dorais*, 241 F.3d 1124, 1130-31 (9th Cir. 2001) (holding that it was a reasonable mistake of fact for an officer to pull over a rental car for being stolen when the rental car company had reported it stolen, even though it was still actually a few hours short of being 48 hours overdue and therefore was not yet considered stolen under state law).

**[9]** Because we hold that Officer Estrada's mistake of fact was not reasonable, he is not entitled to qualified immunity. Officer Estrada asks us to conclude that it is a reasonable mistake to believe that windows that are rolled down and that cannot be viewed at all are in fact rolled up and tinted. This we cannot do. The qualified immunity standard is not so deferential to officers that it will allow a "chimera created by [an officer's] imaginings [to] be used against the driver." *Mariscal*, 285 F.3d at 1130; *see Bingham*, 341 F.3d at 946-48 (denying summary judgment on the basis of qualified immunity where the plaintiff testified that he had broken no traffic laws, but officer testified that he had seen the plaintiff drive across lane lines). Construing the facts in the light most favor-

able to Plaintiff, we must assume that Officer Estrada could not have seen Plaintiff's front car windows at all and that, indeed, the two made eye contact through the open windows. That being so, it would not be reasonable for Officer Estrada to believe that he had seen illegally tinted front windows.

**[10]** The officer-defendants also argue that Officer Estrada had reasonable suspicion to stop and detain Plaintiff because the officer reasonably believed that Plaintiff was trying to avoid him by making several turns and then parking next to a dumpster in a darkened alley. In some circumstances, a suspect's unprovoked, headlong flight can support an officer's reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). But avoidance of the police, standing alone, does not give rise to a particularized, reasonable suspicion that a person is committing a crime. *Id.* "[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Id.* at 125 (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)). As discussed above, Officer Estrada did not have reasonable suspicion to initiate the stop: Plaintiff had violated no traffic laws, and he did not engage in headlong flight upon seeing Officer Estrada. Thus, even if Officer Estrada reasonably suspected that Plaintiff was avoiding him, such noncooperation, without more, does not support a suspicion that Plaintiff was engaged in criminal activity. We therefore affirm the district court's denial of qualified immunity to Officer Estrada for the initial traffic stop.

B. *Excessive Force Claims*

We affirm the district court's denial of summary judgment on the ground of qualified immunity to Officers Estrada and Keegan for claims of excessive force. We agree with the district court's observation that "some of the evidence supports defendants' contention that they had legitimate safety and security concerns, [but] the facts construed in [Plaintiff's] favor[ ] fail to show any basis for the initial stop, the hand-

cuffing, or Officer Estrada's remarks directed to [Plaintiff]." The district court correctly noted that "there is no mistake of law which immunizes an officer for applying force to a suspect for 'smarting off,' nor to one detained without probable cause or reasonable suspicion."

**[11]** In the germinal case of *Terry v. Ohio*, the Supreme Court held that "an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures" when two requirements are met. *Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009) (discussing *Terry v. Ohio*, 392 U.S. 1 (1968)). "First, the investigatory stop must be lawful. . . . Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Id.*

The first *Terry* condition was not met in this case; the traffic stop was unlawful because it did not rest on a reasonable suspicion that a violation of law had occurred. Therefore, it would not have been reasonable for Officers Estrada or Keegan to stop and frisk Plaintiff, let alone use physical force to extract him from his car, shove him against its door, and handcuff him for about half an hour.

The officers argue that the use of force was justified because Plaintiff turned a corner and then pulled over into a darkened alley near a dumpster. This maneuver led the officers to "believe[ ] that the Plaintiff had attempted to purposely evade Officer Estrada in an effort to cover up criminal activity and dispose of contraband." But Plaintiff's avoidance of the police did not convert the initial stop into a legal seizure, nor did it render the level of force, used later, reasonable as a matter of law.

To determine whether the force used was objectively reasonable under the Fourth Amendment, we must "balanc[e] the 'nature and quality of the intrusion' on a person's liberty with

the 'countervailing governmental interests at stake.' " *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

> Thus, "[w]e first assess the quantum of force used to arrest [the plaintiff]" and then "measure the governmental interests at stake by evaluating a range of factors." Factors we consider in assessing the government interests at stake include "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Courts may also consider "the availability of alternative methods of capturing or subduing a suspect."

*Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279-80 (9th Cir. 2001); *Graham*, 490 U.S. at 396; *Smith*, 394 F.3d at 701)).

**[12]** In this case, the use of force against Plaintiff occurred *after* he had complied with Officer Estrada's requests for his driver's license and registration. A check on his driver's license and license plate numbers revealed nothing untoward. Plaintiff did not pose an immediate threat to anyone's safety and was complying with the officer's request to step out of his car. Although Officer Estrada may have thought that Plaintiff's choice of location in which to pull over was evasive, he was not "actively" attempting to evade arrest by flight. There was no evidence to suggest that Plaintiff was either armed or dangerous. Construing the facts in favor of Plaintiff, the use of force was not reasonable and violated clearly established constitutional law. Therefore, Officers Estrada and Keegan are not entitled to qualified immunity.

C.  *The Duration of the Detention*

**[13]** We affirm the district court's denial of summary judgment to all individual defendants on the ground of qualified

immunity for the length of Plaintiff's detention. At the time of his detention, the law was clearly established that a prolonged seizure without a valid investigatory purpose was unreasonable in violation of the Fourth Amendment. *See Royer*, 460 U.S. at 500 ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). Although the Supreme Court has recognized that some investigatory stops made under *Terry* may be reasonable even if they are longer than the "momentary one[ ]" involved in that case, "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *United States v. Place*, 462 U.S. 696, 709 (1983).

[14] We have held that "[t]he critical inquiry is whether the officers 'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.' " *United States v. Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir. 1996) (quoting *Sharpe*, 470 U.S. at 686). In this case, Plaintiff testified that he was detained for 45 minutes, during which he was in handcuffs for 25 to 30 minutes.[12]

The officers argue that there is no bright-line constitutional rule that investigatory stops of a certain duration are automatically unreasonable. They point out that, in *Torres-Sanchez*, 83 F.3d at 1128-29, we held a detention of 20 minutes to be reasonable under the circumstances presented in that case. The officers therefore contend that they are entitled to qualified immunity because, at the time Plaintiff was detained, the law was unclear as to how much longer than 20 minutes a suspect could be detained before the detention became unconstitutionally unreasonable.

---

[12]Although the officers assert that the detention lasted only 28 minutes, we again must construe the facts in the light most favorable to Plaintiff.

The officers misconstrue our holding in *Torres-Sanchez*. We did not hold in that case that all detentions of 20 minutes are per se reasonable. Taken to its logical end, the officers' argument would have us hold that, because the Supreme Court has declined to set a bright-line maximum time limit for investigatory stops, *Sharpe*, 470 U.S. at 685-86, qualified immunity must be granted for all claims of excessively lengthy detention following an investigatory stop. Just because the required analysis in this case involves a fact-intensive determination of reasonableness, rather than application of a bright-line rule, does not mean that there are no situations in which clearly established constitutional violations can occur.

The legal test for deciding whether the length of a detention was unreasonable in violation of the Fourth Amendment was clearly established at the time that the officers detained Plaintiff, and we apply it here. In evaluating the reasonableness of the length of Plaintiff's detention, we "take care to consider whether the police [we]re acting in a swiftly developing situation" and emphasize that we "should not indulge in unrealistic second-guessing" of the officers' actions. *Id.* at 686. We also consider whether "a suspect's actions contribute to the added delay about which he complains." *Id.* at 688. Finally, we determine whether "[i]n attempting to confirm or dispel his suspicions of illegal activity, [the officer] used . . . threats of force, unnecessary delays, exaggerated displays of authority or other coercive tactics." *Torres-Sanchez*, 83 F.3d at 1129.

In this case, Officer Estrada had checked Plaintiff's license with dispatch 36 seconds after the stop. The officers argue, however, that they had reasonable suspicion to detain Plaintiff for a longer duration than would have been justified by a minor traffic stop for tinted windows alone. They contend that, "once Plaintiff failed to pull over on El Camino Real, but took evasive action to avoid Officer Estrada and parked in [a] darkened parking area adjacent to a darkened all[e]y, what started out as a minor traffic stop turned into something far

different." The officers contend that the prolonged detention was caused by Plaintiff's evasive action because it led them to believe that Plaintiff was disposing of drugs in a nearby dumpster and caused them to conduct a search in which they otherwise would not have engaged.

Plaintiff's behavior—pulling over into a darkened parking lot behind a building and turning off his car's lights—certainly played a part in prolonging his detention. But even taking into account the inevitable investigatory delay caused by that behavior, the length of Plaintiff's detention was still unreasonable. Within five minutes of the traffic stop, a total of at least six additional officers had arrived at the scene to help search the area. Officers had removed Plaintiff and his passenger Martinez from the car, handcuffed them, and determined that they were not carrying any weapons. Most importantly, the partial audio recording of the stop reveals that Officer Estrada and his colleagues were not diligently pursuing a means of investigation that was likely to confirm or dispel their suspicions quickly. The recording establishes that the officers were not interrogating Plaintiff about his suspected possession or disposal of drugs. During the 15 minutes of the recording, they did not ask him about drugs even once. Nor did they inquire about the allegedly tinted windows that served as the pretext for the stop.

**[15]** Plaintiff contends that he was detained not as part of an investigative stop, but for an "attitude adjustment." The facts, seen in the light most favorable to him, support that conclusion. The prolonged detention was not for a valid investigatory purpose. The officers were not waiting for backup. They were not waiting for investigatory checks to be run or asking Plaintiff questions that would confirm or dispel their suspicions quickly (or at all). The officers knew everything that they needed to know within five to ten minutes of the stop's initiation. Construing the facts in the light most favorable to Plaintiff, the delay occurred because, as Officer Estrada stated, he did not want to "let three little punks walk

all over [him].” Officer Estrada told Plaintiff that he wanted to “let [Plaintiff] know that I’m the one in charge here, not you.” Prolonging a detention merely to engage in an “exaggerated display[ ] of authority” is unreasonable and unconstitutional. *Torres-Sanchez*, 83 F.3d at 1129.

Reaching this conclusion does not require us to engage in “unrealistic second-guessing” of the officers at the scene. *Sharpe*, 470 U.S. at 686. Officer Estrada himself evidenced an understanding that his behavior was unreasonable, when he said, “I don’t care about complaints.”

**[16]** We therefore hold that an objectively reasonable officer responding to the scene of Plaintiff’s detention would have known that its duration of 45 minutes without probable cause, during which the officers were not diligently pursuing their investigation was an unlawful detention of unreasonable duration in violation of clearly established Fourth Amendment law. We therefore affirm the district court’s denial of summary judgment on the ground of qualified immunity with respect to Plaintiff’s length-of-detention claims against all of the individual officers who responded to the scene.

## D.  *The Search of the Car*

We affirm the district court’s denial of summary judgment on the ground of qualified immunity to the officers who participated in the search of Plaintiff’s car. Construing the facts in the light most favorable to Plaintiff, his consent to the search was not voluntary and the search of his car was therefore unconstitutional. Plaintiff’s Fourth Amendment right to be free of warrantless searches executed pursuant to nonvoluntary consent was clearly established at the time of the traffic stop. No reasonable officer would have believed the search to be lawful under that established law.

**[17]** In the foundational case of *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973), the Supreme Court held:

> [T]he Fourth . . . Amendment[ ] require[s] that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.

The factors to be considered in determining whether consent to a search was voluntary were also clearly established at the time of the traffic stop. Those factors include: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (internal quotation marks omitted). "No one factor is determinative in the equation . . . but 'many of this court's decisions upholding consent as voluntary are supported by at least several of the factors.' " *Id.* (quoting *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 n.3 (9th Cir. 1997)). Because each factual situation surrounding consent to a search is unique, we may also take into account any other factors that we deem relevant. *See, e.g.*, *id.* (weighing a threat from police to take away defendant's children in determining whether her consent to search was coerced or voluntary).

The district court found that three of the five established factors weighed in favor of a finding that Plaintiff's consent to the search of his car was not voluntary. First, Plaintiff was in custody; second, only an incomplete *Miranda* warning was given; and third, Plaintiff was not notified that he could refuse the search. The court found that the other two factors weighed in favor of a voluntariness finding because the officers did not have their guns drawn and Plaintiff was not advised that a search warrant could be obtained.

Examining the totality of the circumstances surrounding Plaintiff's consent, the district court further held that a "reasonable jury could find that [Plaintiff] did not voluntarily consent to a search of his vehicle" because there were seven police officers present, it was approximately 2 a.m., and the "officers had control of [Plaintiff's] vehicle." Having identified and applied the five factors used to determine voluntariness, the district court concluded that the alleged facts established that the officers violated Plaintiff's clearly established Fourth Amendment right against unreasonable searches. Construing the facts in Plaintiff's favor, the court further held that " 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " (Quoting *Saucier*, 533 U.S. at 202.)

The officers analogize this case to *Torres-Sanchez*, 83 F.3d at 1129-30, in which we held that consent given to a police search of the defendant's car during a traffic stop was voluntary. This case, however, is distinguishable. In *Torres-Sanchez*, the suspect was asked three times to confirm his consent to search the car that he was driving. *See id.* at 1126. Moreover, he was not subjected to any "threats of force, unnecessary delays, exaggerated displays of authority or other coercive tactics" by the sole officer who pulled him over. *Id.* at 1129.

This case is more like *Chan-Jimenez*, 125 F.3d at 1326, in which we held that the motorist had been seized because the police officer had retained possession of his driver's license and vehicle's registration. Like Plaintiff, the motorist in *Chan-Jimenez* was not handcuffed at the moment that he gave his oral consent. *See id.* at 1325. Looking at the totality of the circumstances, however, we held that the officer had "manifested an intent to restrain [the plaintiff's] freedom." *Id.* at 1326. We further held that the officer's action of putting his hand on his gun, without drawing it, "let [the plaintiff] know that there could be adverse consequences for any failure to submit to authority. A reasonable person in [the plaintiff's]

position would not have felt free to leave or to ignore the officer's presence and go about his business." *Id.* Those factors led us to hold that Chan-Jimenez had been seized at the time that he gave his consent. *Id.* at 1327. His seizure, together "with the fact that the incident took place on a desert highway, with nobody else in sight," led us to conclude that the officer's request "would have been viewed by a reasonable person essentially as a command to allow a search" of his vehicle. *Id.*

**[18]** In this case, the officers' handcuffing Plaintiff "manifested an intent to restrain [his] freedom." *Id.* at 1326. Officer Estrada also led Plaintiff by the arm to his car before requesting his consent, thereby conveying his continued physical authority. Having already been handcuffed and verbally berated by Officer Estrada, Plaintiff "kn[e]w that there could be adverse consequences for any failure to submit to authority. A reasonable person in [Plaintiff's] position would not have felt free to leave or to ignore the officer's presence and go about his business." *Id.* Therefore, we conclude that Plaintiff was seized at the time that he gave his consent.

Furthermore, it was late at night, Plaintiff still had not been told why he was pulled over, and he was surrounded by seven police officers, some of whom were actively searching the area around his vehicle. Those facts make it clear that Officer Estrada's request that Plaintiff identify the vehicle and that he provide consent to the search "would have been viewed by a reasonable person essentially as a command to allow a search." *Id.* at 1327. Our conclusion is bolstered by the fact that the officers maintained physical control of Plaintiff for a significant period of time after he gave consent. After obtaining consent, Officer Estrada immediately walked Plaintiff by the arm back to his patrol car, and another officer placed Plaintiff in its backseat.

The officers' argument that they could legally conduct a protective nonconsensual search of Plaintiff's car also fails. In

*Michigan v. Long*, 463 U.S. 1032, 1049 (1983), the Supreme Court held that

> the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

(quoting *Terry*, 392 U.S. at 21).[13] In that case, the suspect was intoxicated, had been driving dangerously, and there was a large knife in plain view inside his car, which the suspect was about to reenter. *Id.* at 1050. The present case is not analogous because there existed no specific and articulable facts that would reasonably warrant a belief that Plaintiff was dangerous or that he might gain immediate control of a weapon.

**[19]** For those reasons, we hold that Plaintiff's consent to the search of his car was not voluntary. Accordingly, the search was unconstitutional under law that was clearly established at the time. We therefore affirm the district court's denial of summary judgment to Defendants Estrada, Wheaton, Tassio, and Prickett on the ground of qualified immunity for the search of Plaintiff's car, because there is evidence in the

---

[13]We note, for good measure, that the Supreme Court's recent decisions in *Arizona v. Johnson*, 129 S. Ct. 781 (2009), and *Arizona v. Gant*, 129 S. Ct. 1710(2009), do not affect the analysis in this case. *Johnson* addressed an issue not presented by this case, that is, whether an officer's authority to conduct a pat down ends after the officer inquires into matters unrelated to the justification for the initial traffic stop. 129 S. Ct. at 788. Gant dealt with a search incident to arrest conducted after the suspect had been handcuffed and locked in the back of a patrol car. 129 S. Ct. at 1714. Here, Defendants do not argue the search-incident-to-arrest exception to the Fourth Amendment's prohibition against warrantless searches.

record to permit a finding that each of those officers was involved in the unconstitutional search.

E. *False Imprisonment and Discretionary Immunity*

As to Plaintiff's false imprisonment claim, the officers argue that they are entitled to discretionary immunity under California Government Code section 820.2, which states:

> Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused.

The officers contend that the decision to stop and detain Plaintiff was within their discretion. We disagree and affirm the district court's denial of summary judgment on Plaintiff's false imprisonment claim.

[20] As a matter of law, section 820.2 immunity does not apply to an officer's decision to detain or arrest a suspect. *Gillan v. City of San Marino*, 55 Cal. Rptr. 3d 158, 174 (Ct. App. 2007). "A 'workable definition' of immune discretionary acts draws the line between 'planning' and 'operational' functions of government." *Caldwell*, 897 P.2d at 1325-26 (quoting *Johnson*, 447 P.2d at 360.) "Immunity is reserved for those '*basic policy decisions* [which have] . . . been [expressly] committed to coordinate branches of government,' and as to which judicial interference would thus be 'unseemly.' " *Gillan*, 55 Cal. Rptr. 3d at 174 (alterations in original) (quoting *Johnson*, 447 P.2d at 360). A police officer's decision to detain or arrest a suspect is "not a basic policy decision, but only an operational decision by the police purporting to apply the law." *Id.* Thus, the immunity provided by California Government Code § 820.2 does not apply to claims of false imprisonment or false arrest predicated on an officer's detaining a suspect without reasonable suspicion or probable cause.

*See Gillan*, 55 Cal. Rptr. 3d at 174 (holding that police officers were not immune to suit under section 820.2 for a false arrest claim). We therefore affirm the district court's denial of summary judgment on the officers' claims of discretionary immunity with regard to Plaintiff's false imprisonment claim.

### CONCLUSION

We affirm the district court's order denying the officers' motion for summary judgment on the ground of qualified immunity with respect to Plaintiff's § 1983 claims. We also affirm the district court's order denying the officers' motion for summary judgment on the ground of discretionary immunity under California Government Code section 820.2 with respect to Plaintiff's false imprisonment claims. The remaining portions of the officers' appeal are dismissed. The case is remanded to the district court for further proceedings.

**AFFIRMED in part, DISMISSED in part, and REMANDED.** Costs on appeal awarded to Plaintiff-Appellee.

TASHIMA, Circuit Judge, concurring in part and dissenting in part:

I concur in all of Judge Graber's well-written opinion for the majority, except its holding "that the district court's denial of immunity under California Government Code section 820.2 is a final appealable decision within the meaning of [28 U.S.C.] § 1291," Maj. Op. at 942, from which I dissent. And, although I do not disagree with the majority's reasoning, *id.* at 957-58, I would not reach the merits of Defendants' appeal from the district court's denial of their motion for summary judgment on Plaintiff's state-law false imprisonment claim because we lack jurisdiction over that portion of this interlocutory appeal. Because, in my view, the district court's denial

of state law immunity to the officer defendants is not a final, appealable order within the meaning of 28 U.S.C. § 1291, I would dismiss the appeal of all state law issues for lack of appellate jurisdiction. I therefore respectfully dissent from the majority's assumption of jurisdiction over Defendants' appeal on the false imprisonment claim.

I

I agree with the majority that the denial of "immunity" under state law is not appealable under § 1291 if the immunity at issue is a defense to liability, but is appealable if it is an immunity from suit. Maj. Op. at 940-42. Here, there is no persuasive indication that Cal. Gov't Code § 820.2 provides anything other than a defense to liability. Interlocutory review of the district court's determination of the state-law immunity issue on summary judgment is therefore unavailable.

A

Adopted in 1963 in response to the California Supreme Court's ruling that the general rule of governmental immunity from tort liability was "mistaken and unjust," the California Tort Claims Act ("CTCA") waived the state's sovereign immunity and also eliminated common law liability of public entities. *Muskopf v. Corning Hosp. Dist.*, 359 P.2d 457, 458 (Cal. 1961) (striking down the general rule of state sovereign immunity); *California Supreme Court in 1968-1969: Governmental Immunity*, 58 CAL. L. REV. 303, 305 (1970) (describing the history of the enactment of the CTCA); *see generally* 5 B.E. Witkin, SUMMARY OF CAL. LAW, *Torts* § 222 (10th ed. 2005). Specifically, the CTCA

> establishes the basic rules that public *entities* are immune from liability except as provided by statute (§ 815, subd. (a)), that public *employees* are liable for their torts except as otherwise provided by statute (§ 820, subd. (a)), that public entities are vicariously

> liable for the torts of their employees (§ 815.2, subd. (a)), and that public entities are immune where their employees are immune, except as otherwise provided by statute (§ 815.2, subd. (b)).

*Caldwell v. Montoya*, 897 P.2d 1320, 1325 (Cal. 1995).

The Act's legislative history directly supports the conclusion that § 820.2 is a defense to liability, not an immunity from suit. *See Van Arsdale v. Hollinger*, 437 P.2d 508, 511 (Cal. 1968) (stating that the contemporaneous comments of the Law Review Commission and Legislative Committee are entitled to "substantial weight" in construing the Act). The Act codified certain immunities from tort liability, including the immunity for discretionary acts under § 820.2. In codifying that provision, the Legislature made clear that it was not creating new law but simply maintaining an existing immunity from tort liability for discretionary acts. *Id.* Legislative Comm. Comment ("This section restates the pre-existing California law. The discretionary immunity rule is restated here in statutory form to ensure that unless otherwise provided by statute, public employees *will continue to remain immune from liability* for their discretionary acts within the scope of their employment." (citations omitted) (emphasis added)). The main case cited in the Legislative Committee Comment is *Lipman v. Brisbane Elementary Sch. Dist.*, 359 P.2d 465 (Cal. 1961). In *Lipman*, the California Supreme Court reiterated the "established" rule "that government officials are not personally liable for their discretionary acts within the scope of their authority even though it is alleged that their conduct was malicious." *Id.* at 467 (citations omitted). The statute, and the cases whose rule it restates, speak about immunity from personal liability, not immunity from suit. It does so in the context of the overarching rule that "the rule of governmental immunity may no longer be invoked to shield a public body from liability for the torts of its agents." *Id.* (citing *Muskopf*). In view of this statutory history, it is clear that the Legislature

intended a limited immunity from, or defense to, liability, not a sweeping immunity from suit.

Notably, the state law discretionary acts immunity is virtually identical to that which the federal government enjoys under the Federal Tort Claims Act. *Compare* Cal. Gov't Code § 820.2 ("Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused.") *with* 28 U.S.C. § 2680(a) (excepting the federal government from liability for "Any claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."). We have held that federal sovereign immunity has such broad exceptions carved out of it, that it indicates a legislative intent to surrender the government's sovereign right not to be a litigant and "serves merely to channel litigation into the appropriate avenue for redress." *Alaska v. United States*, 64 F.3d 1352, 1356 (9th Cir. 1995) (holding that the denial of federal sovereign immunity is not a final order reviewable under § 1291). In *Alaska*, we concluded "that, despite the label 'immunity,' federal sovereign immunity is not best characterized as a 'right not to stand trial altogether.'. . . [F]ederal sovereign immunity [i]s more accurately considered a right to *prevail* at trial, *i.e.*, a defense to payment of damages." *Id.* at 1355 (discussing *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863 (1994); and *Pullman Constr. Indus. v. United States*, 23 F.3d 1166, 1169 (7th Cir. 1994)).

The CTCA similarly evinces the California Legislature's intent to channel government liability into a statutory scheme, rather than embrace blanket sovereign immunity from suit. Cal. Gov't Code § 815, Legislative Comm. Comments ("there are many sections providing for the liability of governmental

entities under specified conditions . . . . But there is no liability in the absence of a statute declaring such liability."); *Johnson v. State*, 447 P.2d 352, 363 (Cal. 1968) ("The 1963 Tort Claims Act did not alter the basic teaching [that] when there is negligence the rule is liability, immunity is the exception.") As with federal sovereign immunity, implementing the state's restriction of liability to acts performed outside of a public employee's discretion under § 820.2 "is an ordinary task of statutory interpretation, for which interlocutory appeals are no more necessary (or appropriate) than they are in the bulk of . . . litigation." *Alaska*, 64 F.3d at 1356.

Further, in contrast to federal qualified immunity, if the issue of state law immunity is resolved at trial, the immunity is not "effectively lost." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see Alaska*, 64 F.3d at 1357 ("Immediate appeals are permitted because if officials were unable to obtain prompt review of denials of qualified immunity, the substance of the immunity would be lost. That concern is not the foundation of federal sovereign immunity."). The right bestowed upon defendants by § 820.2 is a right to be free of liability, not litigation, and so "may be vindicated effectively after trial," such that denial at the summary judgment stage does not mean it has been "irretrievably lost in the absence of an immediate appeal." *Alaska*, 64 F.3d at 1355; *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 431 (1985). Because discretionary acts immunity under § 820.2 functions as "a defense from liability rather than a right to be free from trial, the benefits of immunity are not lost if review is postponed." *Alaska*, 64 F.3d at 1356; *cf. Ogborn v. City of Lancaster*, 124 Cal. Rptr. 2d 238, 246 (Ct. App. 2002) (holding that "[t]he doctrine of qualified [ ] immunity is a federal doctrine that does not extend to state tort claims against governmental employees" under Cal. Civ. Code § 52.1).

The California Legislature's intent that § 820.2 function only as a defense to liability and not an immunity from suit is further evidenced by the fact that it did not provide for

immediate interlocutory appellate review of denials of discretionary acts immunity at the demurrer or summary judgment stages. In other situations, where the Legislature *has* provided immunity from suit, it has authorized interlocutory appeals from denials of dispositive motions to strike. Under California's Strategic Lawsuits Against Public Participation, Cal. Civ. Proc. Code § 425.16 (the "anti-SLAPP statute"), "[a]n order granting or denying a special motion to strike shall be appealable under Section 904.1." Cal. Civ. Proc. Code § 425.16(j).[1] For this reason, we have acknowledged that "California law recognizes the protection of the anti-SLAPP statute as a substantive immunity from suit . . . ." *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003).[2] Unlike the anti-SLAPP statute, the CTCA does *not* authorize interlocutory appeals from denials of general demurrers or summary judgment motions based on discretionary acts immunity under § 820.2.[3] This is compelling evidence that the California Legislature in enacting § 820.2 did not seek to provide public employees with immunity from suit.[4] *Englert*, 551 F.3d at 1106.

---

[1]Cal. Civ. Proc. Code § 904.1(13) provides that an appeal may be taken from "an order granting or denying a special motion to strike under Section 425.16."

[2]In contrast, in *Englert v. MacDonell*, 551 F.3d 1099, 1105-07 (9th Cir. 2009), we distinguished the Oregon anti-SLAPP statute from the California anti-SLAPP statute on the basis that Oregon did not provide for interlocutory appeal of anti-SLAPP orders. "The failure of the Oregon Legislature to provide for an appeal from the denial of a special motion to strike provides *compelling evidence* that, unlike their California counterparts, Oregon lawmakers did not want 'to protect speakers from the trial itself' . . . ." *Id.* at 1106 (emphasis added) (quoting *Batzel*, 333 F.3d at 1025).

[3]And, unlike the U.S. Supreme Court in *Mitchell*, 472 U.S. at 525-27, concerning orders denying qualified immunity, the California Supreme Court has not equated interlocutory orders denying discretionary acts immunity under § 820.2 with appealable, final judgments.

[4]The majority argues that the occasional review of statutory immunity claims by way of mandamus somehow alleviates the California Legislature's failure to make such orders appealable. Maj. Op. at 943. But such discretionary review by extraordinary writ in no way indicates a *legislative* intent that the "immunity" provided by § 820.2 be an immunity from suit.

B

The majority's reliance on stray, isolated usages of the phrase "immunity from suit" in a few California cases is unconvincing. Maj. Op. at 942-43. If, as the majority suggests, these turns of phrase are "taken at face value," it must be acknowledged that their use supports either conclusion — that § 820.2 provides immunity from suit or that it provides only a defense to liability. The California Supreme Court's decision in *Caldwell*, for example, uses "immunity from suit" and "immunity from liability" in virtually interchangeable fashion. *E.g.,* 897 P.2d at 1324-25 (discussing whether "governmental entities are generally *immune from suit*" and then noting that the CTCA "establishes the basic rule that public entities are *immune from liability* except as provided by statute") (emphasis added, original emphasis omitted). Whether the court meant "immunity from suit" or "defense to liability" is, at best, unclear. The majority's reliance on *Ramos* is equally unconvincing. Maj. Op. at 943 (citing *Ramos v. County of Madera*, 484 P.2d 93, 98 (Cal. 1971)). The *Ramos* court's language does nothing more than acknowledge the truism that if a court concludes that § 820.2 discretionary act immunity applies at the demurrer stage, the public employee defendant is effectively shielded from the suit. *Ramos*, 484 P.2d at 98 ("Defendants urge that their demurrer to the damage actions should be sustained . . . If such a contention were sound, the individual defendants would be immune from suit."). For the same reasons, the single use of the phrase "entertain a suit" in *Johnson* is equally paltry evidence of legislative intent to grant broad immunity from suit rather than a limited defense to liability. *See, infra,* Part I.C.

The fact that the issue of discretionary acts immunity under § 820.2 *may* sometimes be resolved before trial (as in *Ramos*) does not — contrary to the majority's apparent view — alter the analysis. The Supreme Court has "repeatedly stressed that" the collateral order doctrine is a " 'narrow' exception [which] should stay that way and never be allowed to swallow

the general rule." *Digital Equip.*, 511 U.S. at 868 (quoting *Richardson-Merrell*, 472 U.S. at 430).

> [V]irtually every right that could be enforced appropriately by pretrial dismissal might loosely be described as conferring a 'right not to stand trial.' Allowing immediate appeals to vindicate every such right would move § 1291 aside for claims that the district court lacks personal jurisdiction, that the statute of limitations has run, that the movant has been denied his Sixth Amendment right to a speedy trial, that an action is barred on claim preclusion principles, that no material fact is in dispute and the moving party is entitled to judgment as a matter of law, or merely that the complaint fails to state a claim. Such motions can be made in virtually every case.

*Id.* at 873. "But if immediate appellate review were available every such time, Congress's final decision rule would end up a puny one." *Id.* at 872. Because discretionary acts immunity under § 820.2 may effectively be granted after trial, an interlocutory order denying it is not final. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) (noting that § 1291 does not "permit appeals, even from fully consummated decisions, where they are but steps towards final judgment in which they will merge").

## C

The majority's argument that "the policy underlying the Act suggests that section 820.2 confers immunity from suit," is equally unpersuasive. Maj. Op. at 943. Notwithstanding that inhibition of discretionary action may be a potential consequence of subjecting public employees to lawsuits, the California Supreme Court has declared that "fears that personal exposure to damage suits and judgments would deter the vigorous performance of public responsibilities are no longer a policy basis for immunity." *Caldwell*, 897 P.2d at 1325 (dis-

cussing *Johnson*). This is so because the CTCA contains provisions that directly minimize the burden and deterrent effect of litigation. "To the extent that the ardor of public employees might be affected by the threat of personal liability, these fears will be allayed by the indemnification provisions" of the CTCA rather than through an expansive reading of § 820.2. *Johnson*, 447 P.2d at 359 (analyzing Cal. Gov't Code §§ 825, 825.4). As the *Johnson* court explained:

> Historically, the justification for attaching immunity to "discretionary" actions of public officials was to protect such employees from the spectre of extensive personal tort liability. Judge Learned Hand advanced the classic articulation of this policy: . . . "[I]f it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties."

447 P.2d at 358 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)); *see also Caldwell*, 897 P.2d at 1324 (explaining that [t]he historical basis of the [discretionary acts immunity] rule was that fear of civil lawsuits might deter officials from the zealous and unflinching discharge or their public duties"). Rejecting this policy concern as a basis for an expansive grant of immunity under § 820.2, the *Johnson* court concluded that "California's statutory provisions for indemnification of public officials largely remove the dangers that troubled Judge Hand." *Johnson*, 447 P.2d at 358. Therefore, because the CTCA protects public employees from "any requirement that he assume the financial and mental burden of defending his official conduct in a personal suit filed

against him" and "faces only a slim danger of ultimate personal liability," the majority's conclusion that § 820.2 must be read broadly as a blanket immunity from suit to satisfy this policy concern, as the California Supreme Court has recognized, is unsupportable. *Johnson*, 447 P.2d at 359.

For all of these reasons, the district court's denial of summary judgment on state statutory immunity grounds does not qualify as a final decision under the collateral order doctrine. Therefore, I conclude that we lack appellate jurisdiction under § 1291, as construed in *Mitchell,* to consider the state-law issues Defendants raise on appeal.

## II

I would further conclude that we lack pendent appellate jurisdiction over these issues because they are not "inextricably intertwined" with the federal qualified immunity decision. "Pendent appellate jurisdiction refers to the exercise of jurisdiction over issues that ordinarily may not be reviewed on interlocutory appeal, but may be reviewed on interlocutory appeal if raised in conjunction with other issues properly before the court." *Cunningham v. Gates*, 229 F.3d 1271, 1284 (9th Cir. 2000) ("We have consistently interpreted 'inextricably intertwined' very narrowly.").

> Two issues are not "inextricably intertwined" if we must apply different legal standards to each issue. Rather, the legal theories on which the issues advance must either (a) be so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal, or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue.

*Id.* (internal citations omitted).

The state-law issues raised by Defendants are not inextricably intertwined with the federal qualified immunity determi-

nation. The legal standard for qualified immunity is entirely different from the legal standards governing state torts, and each is based on a different body of law. We can resolve the qualified immunity question without reaching these state law issues. Whether or not the officers are entitled to qualified immunity will not necessarily resolve the issues of whether the officers are liable for assault or battery, entitled to discretionary acts immunity under § 820.2, or may be held liable under Cal. Civ. Code § 52.1. Because the state law issues may be determined independently from the qualified immunity decision, these issues are not "inextricably intertwined" and we may not exercise pendant appellate jurisdiction over them.

## III

I would venture to state that plaintiffs' counsel in virtually every § 1983 action throughout the Circuit will find it prudent to plead supplemental state law claims. The majority's novel ruling that pretrial rulings in those supplemental claims are subject to interlocutory appeals to the same extent as pretrial denials of qualified immunity on federal claims can only result in the needless proliferation of interlocutory appeals, the resolution of which, in many cases, will not be as sraightforward as in this case.

For the reasons stated herein, I respectfully dissent from the majority's assumption of appellate jurisdiction over Defendants' interlocutory appeal on Plaintiff's false imprisonment claim.